Matter of Stevens v New York State Div. of Criminal Justice Servs. (2022 NY Slip Op 03062)





Matter of Stevens v New York State Div. of Criminal Justice Servs.


2022 NY Slip Op 03062


Decided on May 05, 2022


Appellate Division, First Department


Gische, J.P. 



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: May 05, 2022
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Judith Gische
Troy K. Webber, Jeffrey K. Oing, Anil C. Singh, John R. Higgitt


Index No. 151522/18 Appeal No. 14847-14847A Case No. 2020-03746 2021-00560 

[*1]In the Matter of Terrence Stevens et al., Petitioners-Appellants,
v
The New York State Division of Criminal Justice Services et al., Respondents-Respondents. Brendan Parent, Amicus Curiae.



Petitioners appeal from a judgment of the Supreme Court, New York County (Shlomo S. Hagler, J.), entered October 20, 2020, denying their petition to, among other things, annul the Familial DNA Search (FDS) Regulations codified at 9 NYCRR 6192.1 and 6192.3 on October 18, 2017, effective the same date, and dismissing the proceeding brought under article 78. Petitioners also appeal from an order, same court and Justice, entered on or about March 27, 2020, which explained the reasoning for the October 20, 2020 judgment.




Gibson, Dunn & Crutcher LLP, New York (Doran J. Satanove, Joseph Evall and Lavi M. Ben Dor of counsel), and The Legal Aid Society, New York (Terri Rosenblatt and James Pollock of counsel), for appellants.
Letitia James, Attorney General, New York (Matthew W. Grieco and Steven C. Wu of counsel), for respondents.
Brendan Parent Esq., NYU Grossman School of Medicine, New York, amicus curiae.



Gische, J.P. 


In this appeal we are asked to consider whether the respondent agencies, as opposed to the New York State legislature, had the authority to expand the use of the New York State DNA database for familial DNA searches in connection with law enforcement's investigation of crimes. We are not tasked with considering whether familial DNA searches are a good and effective tool for law enforcement and/or what limiting measures may be required to balance competing societal interests. Indeed, we recognize that use of familial DNA matching has produced laudable crime solving outcomes in many cases. Rather, our inquiry focuses on who in New York State is authorized to make the decision of whether and how best to use this law enforcement tool.
Petitioners also argue that even if respondents were authorized to promulgate the regulation, respondents' actions are otherwise arbitrary and capricious because they did not consider the disproportionate effect the regulation has on persons of color. Finally, we are tasked with considering whether the petitioners have standing to raise these challenges.
The background of this dispute is as follows:
Petitioners are relatives of persons whose genetic profiles are in the New York State DNA database. Respondents, the New York State Division of Criminal Justice Services (DCJS), the New York State Commission on Forensic Sciences (Commission) and the New York State Commission on Forensic Science DNA Subcommittee (Subcommittee) are independent agencies within the executive branch of state government.
In 1994, the Legislature enacted the DNA Databank Act, which requires the creation of a statewide database of DNA records based on samples collected from people convicted of crimes (L 1994, ch 737, codified at Executive Law § 995 et seq). The act also created the Commission and the Subcommittee (Executive Law §§ 995[9]-[10]; 995-a[1]; 995-b[13][a]). The Commission and Subcommittee are supported by the resources of DCJS (see Executive Law § 995-a) and the Commissioner of DCJS is the chair of the Commission [*2](Executive Law § 995-a[1]). Pursuant to the Databank Act, the statewide databank consists of DNA profiles based on genetic information collected from "designated offenders" as expressly defined in the statute (see Executive Law §§ 995[6], 995-c).
Although originally the definition of designated offenders was limited to persons convicted of certain serious crimes, over time the category of persons who were required to provide their DNA for the databank was greatly expanded. The expansion of designated offenders was done solely through legislative action. Now (since 2012) the database includes all DNA information of all persons convicted of a felony or a misdemeanor in New York State (Executive Law §§ 995[7], 995-c[3]). Petitioners claim, based on New York State data on arrests, that the majority of data-banked DNA information is from people of color. [FN1] Post-conviction and sentencing, designated offenders are required to provide DNA samples, regardless of whether DNA was required as part of the investigation of the underlying crime for which they were convicted (Executive Law § 995—c[3] ). The collected DNA samples are tested and analyzed at authorized forensic DNA laboratories where profiles are created. The profiles are then indexed and eventually uploaded to the state databank (Executive Law § 995—c[5]). The New York State Databank is part of a combined DNA Index System, known as CODIS, a nation-wide searchable software program maintained by the FBI that supports criminal justice DNA databases (https://www.criminaljustice.ny.gov/forensic/dnadatabank.htm#:~:text=The%20state's%20DNA%20Databank%20is,information%20about%20the%20CODIS%20program.s://www.fbi.gov/services/laboratory/biometric-analysis/codis/codis-and-ndis-fact-sheet#:~:text=CODIS%20is%20the%20acronym%20for,used%20to%20run%20these%20databases"https://www.fbi.gov/services/laboratory/biometric-analysis/codis/codis-and-ndis-fact-sheet#:~:text=CODIS%20is%20the%20acronym%20for,used%20to%20run%20these%20databases [last accessed February 9, 2022]; Matter of Samy F. v Fabrizio, 176 AD3d 44 [1st Dept 2019] appeal dismissed 34 NY3d 1033 [2019]).[FN2]
Pursuant to the Databank Act, the Commission and its Subcommittee are empowered to, among other things, develop minimum standards and a program of accreditation for all forensic laboratories in New York State. As relevant to this appeal, the Commission and its Subcommittee are statutorily authorized to promulgate standards for a determination of a "match" between DNA records contained in the DNA databank and a DNA record of a person submitted for comparison therewith (Executive Law § 995-b[12]). These duties and authority have remained unchanged since the Databank Act's original enactment.
The Databank Act requires that the Subcommittee assess proposed DNA methodologies and then make binding recommendations to the Commission, which the Commission must then formally adopt (Executive Law § 995-b[13][b]). The DCJS, after public notice, publishes the recommendation as part of the New York City Code of Rules and Regulation (NYCRR). Enacting these regulations are quasi-legislative acts, having the effect of law (Matter of Aufiero v New York State Div. of Criminal Justice Servs., 173 AD3d 1320, 1322 [3rd Dept 2019], lv denied 34 NY3d 912 [2020]; see Matter of General Elec. Capital Corp[*3]. v New York State Div. of Tax. Appeals, Tax Appeal Trib., 2 NY3d 249, 254 [2004][a duly promulgated regulation has the force and effect of law]; see also Thrun v Cuomo, 112 AD3d 1038, 1040—1041 [3rd Dept 2013], lv denied 22 NY3d 865 [2014]).
From its inception, the Databank Act permitted searches by law enforcement agencies and district attorney's offices to determine whether DNA in the databank provided a direct match to DNA recovered in connection with a criminal investigation (forensic DNA) (Executive Law § 995-c[6][a]). A forensic DNA profile is created by analyzing repeating sequences (alleles) found at 13 specific regions or loci on an individual's DNA. The targeted loci, known as "junk DNA," differ from one individual to the next and can, therefore, be used for identification purposes. The particular loci used, however, are not associated with any known physical or medical characteristic and do not provide a basis for determining or inferring anything else about that person (see Boroian v Mueller, 616 F3d 60, 66 [1st Cir 2010]). On its most simple level, a direct match is made when 13 pairs of alleles from the forensic DNA match the profile of someone in the databank. A direct match means that the forensic DNA and the DNA in the New York State Databank are from the same person. If a search yields a direct match, then the identity of the person in the DNA databank is released to law enforcement. There are circumstances, however, when fewer than 13 pairs of alleles match, but there are otherwise a sufficient number of matching alleles to conclude that the forensic DNA may belong to a close biological relative of the person profiled in the DNA databank. This is referred to as a partial match. In 2010 respondents, subject to certain restrictions, authorized the release of partial match information to law enforcement [FN3] (9 NYCRR 6192.1[s], 6192.3[b],[c],[f],[g][3]).
Familial DNA searching has been the subject of international attention since the early 2000s (see Agueros, J, Liberty, Justice and Technology: Why Familial DNA Searches Must Confront the Rigor of the American Political Process, Criminal Law Bulletin, Vol 48, Issue 4, ART 6, page 6 [Summer 2012]). For example it has been successfully used to solve crimes in the United Kingdom since 2003 (Science of the Future: Identifying Criminals Through Their Family Members, DNA Forensics: Familial searches allows law enforcement to identify criminals through their family members DNAForensics.com [last accessed February 9, 2022] ). Here in the United States, it was used in California in 2008 to identify the "Grim Sleeper" serial killer (Press Release, California Office of the Att'y Gen., California's Familial DNA Search Program Identifies Suspected "Grim Sleeper" Serial Killer (July 7, 2010)(internet), and also in in 2018, to apprehend another serial killer, the "Golden State Killer" (https://www.dailymail.co.uk/news/article-5666773/UK-police-use-DNA-techniques-used-catch-Golden-State-Killer.html[*4][last accessed January 20, 2022]; https://www.forbes.com/sites/jvchamary/2020/06/30/genetic-genealogy-golden-state-killer/?sh=6173c5185a6d [last accessed January 20, 2022]). In 2005, it was used when Kansas authorities apprehended the "BTK killer" through his daughter's DNA sample collected during a routine pap smear (Police Use DNA to Track Suspects Through Family : NPR, https://www.npr.org/templates/story/story.php?storyId=17130501 [last accessed February 9, 2022] ). In New York State, it was recently reported that familial DNA helped solve a 1999 cold case (How Familial DNA Evidence Led to Arrest in '99 Cold Case Killing of Bronx Girl, https://www.nbcnewyork.com/news/local/crime-and-courts/how-familial-dna-evidence-led-to-suspects-arrest-in-99-cold-case-killing-of-bronx-girl/3426818/[last accessed February 10, 2022]). [FN4]
Familial DNA searches in forensic investigations are premised on years of scientific research, which supports a conclusion that a less than full DNA match still yields genetic information sufficient to identify close biological relatives. Although the science is similar, familial match searches primarily differ from full and partial matches in that they are a deliberate search for a close biological relative of someone in the databank in order to develop a lead to identify a person who may have left forensic DNA at the crime scene (see 9 NYCRR 6192.3). Even where a first analysis yields evidence of a family match, additional scientific testing analysis is then conducted to further refine the pool of familial matches. The family match information allows forensic analysts to create a family tree. Law enforcement then investigates for coordinating points of information to either connect or rule out any of these genetic relatives from the crime being investigated. Further investigations may include questioning the relative or other witnesses, investigating whether the relative has some geographic proximity to the crime and in some cases, may involve looking for the relative's abandoned or discarded DNA, for example, in the trash (People v Kluge, 180 AD3d 705, 707 [2d Dept 2020] [discarded gum]). There is little dispute that familial DNA testing is a useful tool in investigating crimes.[FN5]
Debate about the use of familial DNA searches in New York State can be traced back to at least 2014. From that time, many legislative bills permitting familial DNA searches were proposed in both the Assembly and Senate. Most were never reported out of committee (2014 NY Assembly Bill A-9247, 2015 NY Assembly Bill A-1515, 2017 NY Assembly Bill A-683, 2016 NY Senate Bill S-8216). In 2017, a bill passed the Senate that would have allowed for familial DNA testing under certain circumstances and would have allowed respondents to determine best practices for implementing a familial search policy (2017 NY S-2956). Although S-2965 passed the Senate, after referral to the Assembly, it was never voted out of the governmental operations committee (Committee).[*5]
In late 2016, respondents were also considering the issue of whether to authorize use of the New York State DNA databank for familial searches. In December 2016, the Commission invited public comment on the subject. By February 10, 2017, the Commission formally requested that the Subcommittee consider whether familial DNA searching should be allowed in New York.
After soliciting public comment, on May 19, 2017, the Subcommittee submitted its binding recommendation authorizing familial DNA searches to the Committee. The recommendation was subject to certain restrictions regarding when such searches were to be permitted and practices on how to request them. The Committee formally adopted the recommendation on June 16, 2017. On October 18, 2017, after notice and comment, DCJS promulgated the recommendation as part of a formal regulation (9 NYCRR 6192).
The familial DNA regulation prescribes a comprehensive protocol that must be undertaken before a familial DNA search may be permitted and it also places restrictions on the ability to obtain such information. Some of the broader requirements of the protocol are as follows:
Familial DNA searches are only authorized if there is no direct match or partial match in the DNA databank (9 NYCRR 6192.3[h]);
The forensic DNA must be associated with at least one of the specifically enumerated crimes listed in the regulation or be a crime that presents a significant public safety threat (9 NYCRR 6192.3[h][1][iv]).[FN6]
No such search will be allowed unless prior reasonable investigative efforts have been taken in the case or exigent circumstances exist (9 NYCRR 6192.3[h][2]).
Only family members within kinship threshold values determined by respondents would be subject to disclosure. While this would most likely be a father, son, or full sibling of the target profile, respondents have allowed themselves discretion on this issue (https://troopers.ny.gov/system/files/documents/2021/10/familial-search-fact-sheet.pdf [last accessed February 9, 2022]).
Ultimately the Commissioner is the decider whether in any particular case a familial DNA search is warranted (9 NYCRR 6193.3[i][2][ii]).
There is no provision in the regulation for an identified relative to be notified and/or challenge the search before law enforcement could proceed with its investigation.
Petitioners brought this article 78 proceeding challenging the regulation on the ground that it was made in violation of lawful procedure, was arbitrary and capricious and an abuse of discretion (CPLR 7803[3]) (see New York City Health & Hosps. Corp. v McBarnette, 84 NY2d 194, 201, 204-205 [1994]). Proceedings challenging an agency's decision or action are subject to a four-month statute of limitations (CPLR 217; McBarnette, 84 NY2d at 205). This article 78 petition challenging the amendment was timely brought within four months of its enactment. Supreme Court, although finding that petitioners had standing, otherwise denied the petition on the merits. This [*6]appeal ensued.
STANDING
At the outset, we consider the gateway issue of standing, because it determines whether a litigant is even allowed access to the courthouse to plead the merits of a particular dispute (Matter of Association for a Better Long Is., Inc. v New York State Dept. of Envtl. Conservation, 23 NY3d 1, 6 [2014]). Petitioners are individuals who have never been convicted of a crime and they have no personal genetic information stored in the New York State DNA databank. Each of them, however, has a biological brother who was a convicted offender in New York State. Petitioners and their brothers are black Americans. Each petitioner's brother has genetic information stored in the DNA databank. Neither petitioner has been asked or mandated to provide DNA for comparison. Because they are law abiding citizens, neither petitioner knows if they have been targeted for investigation as a result of a familial DNA search, but they harbor great concern and anxiety that they might be investigated for no other reason than that they share family genetics with a convicted criminal.
Respondents argue that because neither petitioner has sustained any injury in fact, neither of them has standing to bring this petition. They claim that petitioners' injuries are speculative because they are based upon events which may never come to pass. In addition, respondents claim that petitioners do not fall within the zone of interests protected by the DNA Databank Act.
A party challenging governmental action must meet the threshold burden of establishing that an injury in fact has been suffered and that the injury asserted "falls within the zone of interests or concerns sought to be promoted or protected by the statutory provision under which the government has acted" (Matter of Mental Hygiene Legal Serv. v Daniels, 33 NY3d 44, 50 [2019]). At the outset, we reject respondents' arguments, echoed by the dissent, that petitioners do not satisfy the zones of interest prong of standing. Respondents, relying on the Databank Act itself, argue that the purpose of the Databank Act is to support criminal investigations, and it is not intended to promote or protect the interest of family members of those persons with profiles in the New York State Databank. Respondents fail to acknowledge, however, that privacy concerns were weighed and balanced by the Legislature in originally enacting and then incrementally expanding the DNA Database Act. 
More importantly, respondents fail to analyze this prong of standing based upon the regulation challenged in this proceeding; a regulation that is purportedly derived from the Databank Act; a regulation that balances the interest of the family members to be free from governmental intrusion against the investigative needs of law enforcement. Illustrative of the balancing, the regulation limits familial DNA searches to only particular crimes that pose significant safety threats to the public. DNA databank searches for direct and partial [*7]matches are not so limited. By not allowing kinship searches for every crime, respondents decided that family members should be insulated from investigations concerning lesser crimes. Thus, clearly the rights of family members were taken into consideration by respondents in deciding who and what interests would be protected by the regulation. We conclude that petitioners easily satisfy the zone of interest requirement when viewed from the vantage point of balancing family member interests against law enforcement needs.
"The injury-in-fact requirement necessitates a showing that the party has an actual legal stake in the matter being adjudicated and has suffered a cognizable harm that is not tenuous, ephemeral, or conjectural but is sufficiently concrete and particularized to warrant judicial intervention" (Daniels, 33 NY3d at 50 [internal quotation marks and citations omitted]). The injury in fact cannot be speculative (Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 812 [2003]).
Petitioners have standing because the regulation subjects them to the peculiar risk that they will be targets of criminal investigations for no other reason than that they have close biological relatives who are criminals.[FN7] They claim that because they are persons of color, their risk of being investigated is greater than the general population, based upon the disproportionate number of people of color in the databank. In this case, the heightened risk of police encounters, along with resulting fear and anxiety, establish a cognizable injury sufficient to confer standing. As articulated by one legal scholar, "the investigative process is not painless for the apparent relative who must suffer the distress of being the target of police investigation" (Kaye, D, The Genealogy detectives: A Constitutional Analysis of Family Searching, 50 Am Crim L Rev 109, 156 [2013]). Petitioners did not have to wait for the specific adverse contact contemplated by the regulation to occur in order to sustain an injury in fact (see Lino v City of New York, 101 AD3d 552, 555-556 [1st Dept 2012]).
Our conclusion, that petitioners satisfy the injury-in-fact requirement, is consistent with the following observation by the Court of Appeals: 
"A fundamental tenet of our system of remedies is that when a government agency seeks to act in a manner adversely affecting a party, judicial review of that action may be had. The increasing pervasiveness of administrative influence on daily life on both the State and Federal level necessitates a concomitant broadening of the category of persons entitled to a judicial determination as to the validity of proposed action" (Matter of Dairylea Coop. v Walkley, 38 NY2d 6, 10 [1975] [internal citations omitted]).
Where a denial of standing would in effect pose an impenetrable barrier to judicial scrutiny of governmental action, "our duty is to open rather than close the door to the courthouse" (Saratoga 100 NY2d at 814). Standing rules should not [*8]be applied in an overly restrictive manner where the result would be to shield an action from judicial review (Matter of Sierra Club v Village of Painted Post, 26 NY3d 301, 311 [2015]). The standing requirement, which is designed to ensure that the bearer of a lawsuit is one with a genuine stake in the litigation, should not serve as a technical barrier to review of administrative action. 
Respondents' argument, that there is no standing to challenge this regulation until someone at least is an actual target of the regulation and then only after they have personal contact with law enforcement, would put this regulation out of reach from judicial scrutiny. When an agency promulgates a regulation, it acts in a quasi-legislative capacity. The propriety in promulgating any regulation may only be challenged in a [CPLR] article 78 proceeding that is subject to a four-month statute of limitations (see Thrun v Cuomo, 112 AD3d 1038, 1039-1040 [3d Dept 2012]). The claim accrues when the regulation is promulgated (Matter of Aufiero v New York State Division of Criminal Justice Servs., 173 AD3d 1320, 1322 [3rd Dept 2019]).[FN8] Here the regulation was promulgated October 18, 2017. Respondents admit that as of April 2018 (which was beyond the statute of limitations) only nine familial DNA applications had been approved. We do not know if any of them were approved during the limitations period. We do not know if any of them resulted in matches that were leads in any criminal investigation in that period. We do not know if anyone, as a result of a familial match, was ever approached by law enforcement during the applicable period. There is no requirement in the challenged regulation for the targeted individual to be notified. Respondents' factual scenario on what constitutes an injury in fact would result in no one having the ability to challenge the promulgation of this regulation.
We reject respondent's argument that because petitioners have no reasonable expectation of privacy in the DNA of others maintained in the DNA databank, they have no standing. This standing concept, based upon expectation of privacy, relates to challenges against unreasonable search and seizures (see United States v Amerson, 483 F3d 73, 77 [2d Cir 2007]). The claims made in this proceeding, however, are limited to whether the regulation were promulgated in derogation of law, not whether they were executed in violation of the Fourth Amendment of the United States Constitution.
We also reject the dissent's view that challenges to the procedure by which the familial DNA regulation was promulgated could ultimately be adjudicated in a criminal proceeding, where a Fourth Amendment challenge could be raised or a motion made to suppress evidence pursuant to CPL 710.20. First, there are serious questions regarding whether a defendant, prosecuted using family DNA match evidence, would have the requisite privacy interest to raise any Fourth Amendment argument. There would be no standing to assert [*9]a challenge to the forensic DNA collected at the crime scene, because abandoned or voluntarily discarded DNA is not protected by the Fourth Amendment (Jones v Meehan, 2018 WL 459662 *10; see United States v Lee, 916 F2d 814, 818 [2d Cir 1990]). Moreover, because Fourth Amendment rights are personal (Rakas v Illinois, 439 US 128, 133 [1978]), it is unclear that a defendant could challenge the use of DNA collected from a relative (see generally Julie Agueros, at p. 9).[FN9]
Perhaps most importantly, this proceeding is not strictly speaking a Fourth Amendment challenge to the family DNA regulation. While kinship DNA searches may implicate Fourth Amendment privacy issues (see Nicholas v Goord, 430 F3d 652, 669-672 [2d Cir 2006]), those issues are not directly raised here. Petitioners are not arguing that the regulation either on its face or in its application violates the Fourth Amendment (see City of Los Angeles v Patel, 135 S Ct 2443, 2452 et seq. [2015]). They argue that the regulation was promulgated in violation of administrative procedure. Objections to regulatory actions taken by an administrative body can only be challenged in an article 78 proceeding (see e.g. Matter of Acevedo v New York State Dept. of Motor Veh., 29 NY3d 202, 226 [2017]; Matter of Aufiero, 173 AD3d 1320, 1322; Matter of General Elec. Cap Capital v New York State Div. of Tax. Appeals, Tax Appeal Trib., 2 NY3d 249, 54 [2004][a duly promulgated regulation has the force and effect of law]; see also Thrun v Cuomo, 112 AD3d at 1040—1041).
RESPONDENTS' AUTHORITY TO ADOPT THE CHALLENGED REGULATION
The separation of powers doctrine has been described as the "bedrock" of our State's system of justice, with three coordinate and coequal branches of government, each charged with performing particular functions (Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 27 NY3d 174, 178 [2016]; Matter of Maron v Silver, 14 NY3d 230, 258 [2010]). It is black letter law that under the separation of powers doctrine, the legislature has responsibility for making critical, primary policy decisions, while the executive branch is responsible for implementing those policies (Matter of Leading Age N.Y., Inc. v Shah, 32 NY3d 249, 259-260 [2018]). In addition, respondents, as administrative agencies acting under the auspices of the executive branch of government, are only authorized to prescribe rules and regulations that are consistent with the delegation of authority contained in the enabling legislation (id.). "[A] legislature may enact a general statute that reflects its policy choice and grants authority to an executive agency to adopt and enforce regulations that expand upon the statutory text by filling in details consistent with that enabling legislation" (id. at 260). The issues of separation of powers and delegation of power are overlapping doctrines and are often considered together (Greater N.Y. Taxi Assn. v New York City Taxi and Limousine Commn., [*10]25 NY3d 600, 608 [2015]). Where an agency promulgated regulation that crossed the line between administrative rule making and legislative policy making, the agency has exceeded its delegated power and also violated the separation of powers (Matter of Leading Age at 260).
Our jurisprudence recognizes that it is not an easy task to draw a clear line between the functions of the legislative and executive branches of government (Greater N.Y. Taxi Assn., 25 NY2d at 609). Nonetheless, in the seminal case of Boreali v Axelrod (1 NY2d 1 [1987]), the Court of Appeals articulated four factors as guidelines for the court to consider when deciding whether "the difficult-to-define line between administrative rule-making and legislative policy-making has been transgressed" (Boreali at 11). They are:
"whether (1) the agency did more than balance costs and benefits according to preexisting guidelines, but instead made value judgments entailing difficult and complex choices between broad policy goals to resolve social problems; (2) the agency merely filled in details of a broad policy or if it wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance; (3) the [L]egislature has unsuccessfully tried to reach agreement on the issue, which would indicate that the matter is a policy consideration for the elected body to resolve; and (4) the agency used special expertise or competence in the field to develop the challenged regulation."
The Boreali factors have been utilized by the Court of Appeals in many cases since they were first identified (see e.g. Leading Age, 32 NY3d 249, 260-261; Acevedo, 29 NY3d 202, 223-226 [2017]; Greater New York Taxi Assn., 25 NY3d 600 610-612; Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d 681, 692-693 [2014]). The Boreali factors, however, are not mandatory, nor exclusive, nor are they to be rigidly applied (Matter of NYC C.L.A.S.H., 27 NY3d at 180). They need not be weighed evenly (Greater New York Taxi Assn., 25 NY3d at 612). Boreali is not simply an escape hatch for those who are unhappy with a regulation (Acevedo, 29 NY3d at 226). The factors are closely related and overlap one another (NYC C.L.A.S.H., 27 NY3d at 180; Greater New York Taxi Assn., 25 NY3d at 608). The court's analysis must be made with a proper application of common sense. Utilizing the Boreali and any other relevant factors, we analyze this case as follows:
1.Did the agency do more than balance costs and benefits according to preexisting guidelines by making value judgments entailing difficult and complex choices between broad policy goals to resolve social problems?
Under this first factor the court considers the breadth of the enabling legislation as well as whether the agency created a regulatory scheme, laden with exceptions, based solely upon economic and social concerns (NYC C.L.A.S.H., Inc., 27 NY3d at 181, citing Boreali, 71 [*11]NY2d at 11-12). In this case the first Boreali factor weighs heavily in favor of petitioners.
Under the enabling legislation, the powers and the duties of the respondents were to "[p]romulgate standards for a determination of a match between the DNA records contained in the state DNA [databank] and a DNA record of a person submitted for comparison therewith" (Executive Law § 995-b [12]).
Petitioners claim that the reference to "match" does not give respondents authority to propose an additional use of the information in the DNA databank. The reference to "match," they argue, is to establish the scientific standards, benchmarks, and methodologies that laboratories should follow in reporting their conclusions that DNA in the databank matches the forensic sample provided by law enforcement. Respondents, on the other hand, argue that because the overall purpose of the Databank Act is to aid law enforcement, the broad authority conferred upon them to determine "matches" includes emerging science on new applications and uses for DNA in law enforcement.
There is no basis to conclude that the reference to "match" in the enabling legislation was intended to give respondents broad authority to decide any and all scientific uses that the DNA contained in the databank may be put to, as long as it serves the general purposes of law enforcement. There is no reference to familial DNA matching in the Databank Act at all. Nor could there be, because familial DNA testing did not even exist at the time the Databank Act was originally passed in 1994. Executive Law § 995-c contains repeated references to "collected" samples, consistent with the overarching purpose of the databank which is to establish a computerized index designated convicted offenders' DNA. The overarching powers and duties of the Commission are to develop minimum standards and a program of accreditation for all forensic laboratories in this state to increase the effectiveness, reliability and accuracy of DNA testing (Executive Law §§ 995-b[1], [2][a], [b]). Thus, the Commission's mandate is to ensure the accuracy, efficiency and integrity of the DNA databank operation, in other words, provide "quality control" (Executive Law § 995-b[13][d]).
Decisions regarding whether and under what circumstances the database should be used for familial DNA testing go well beyond science and quality control; they are driven primarily by social policy. The overarching public policy consideration in deciding whether to permit familial DNA testing in the first instance necessarily involves balancing the civil liberty interests of citizens to be free from unreasonable governmental interference against the societal interest of law enforcement in investigating crimes. Because familial DNA searches can result in investigations triggered only by a genetic match to someone previously convicted on an unrelated crime, it implicates important liberty interests of the family members who may be targeted. Conversely, society [*12]has an interest in and benefits from the utilization of emerging scientific methods that aid in the investigation and resolution of unresolved crimes. Balancing these interests requires evaluation of competing choices and ultimately drawing a conclusion on what society should or should not allow. Here, the balancing of policy considerations is further complicated by the NYS DNA database being overwhelmingly populated with the DNA of people of color. Thus, the likelihood of being targeted because someone is a person of color (likely a male) is increased, a consideration that can only be evaluated as a matter of social policy, not science. Policy decisions not only implicate whether to allow familial DNA testing in the first instance, but also under what circumstances. Here, for example, the regulations only permit familial DNA testing for serious enumerated crimes. This limitation imposed by respondents is not a scientific decision, but rather a policy decision and value judgment about where to draw a line (Greater New York Taxi Assn., 25 NY3d at 610). Moreover, respondents vested the Commissioner with the final authority to determine whether a familial DNA search should be allowed. There is currently no other oversight and accountability. The decision whether to use indexed DNA data in this manner is not a ministerial consideration. It implicates a fundamental policy determination that the applications need not be reviewed by a detached and neutral magistrate.
We are not required to determine whether respondents made a good or beneficial policy decision. The fact that the decisions respondents made are by their very nature policy driven, greatly favors a conclusion that they were made in excess of respondents' authority.
2. Did the agency fill in the details of a broad policy or did it create its own comprehensive set of rules without the benefit of legislative guidance?
This second Boreali factor, which has been referred to as the tabula rasa consideration (NYC C.L.A.S.H., Inc., 27 NY3d at 182), requires that we consider whether the agency filled in the details of a board policy or it wrote on a "clean slate," creating a comprehensive set of rules, without the benefit of legislative guidance (id. at 182).
In this case, the second factor overlaps with the first Boreali factor. Prior to the adoption of the family DNA regulation there was no legislative guidance at all on this particular use of DNA information. In fact, there was no known consensus within the New York legislature on what should be done with respect to searches in the New York State databank for familial matches (see decision infra). The Databank Act, although anticipating advancements in scientific methodologies, technologies and standards which may not yet be approved or accredited does not provide any guidance on a vastly expanded use of the databank.
3.Whether the legislature has unsuccessfully tried to reach agreement on the issue.
The third Boreali factor requires consideration [*13]of whether the legislature has unsuccessfully tried to reach agreement on the issue, because lack of consensus would "indicate that the matter is a policy consideration for the elected body to resolve" (Matter of NYC C.L.A.S.H, 27 NY3d at 183, citing Greater NY Taxi Assn., 25 NY3d at 612; Boreali, 71 NY2d at 13). The Court of Appeals has recognized, however, that drawing such a conclusion from legislative inaction might not be desirable in all cases because of the inherent ambiguity (id.). In this case, bills permitting familial DNA searches were repeatedly before the legislature from at least 2014, but not one of them passed. All but one of the bills never made it out of committee. A bill was passed in the Senate in 2017, but never voted on in the Assembly. Because the bills on familial DNA searches were mostly never debated in any legislative chamber, this factor does not weigh in petitioners' favor (Leading Age, at 259-260; Matter of New York State Land Tit. Assn., Inc., v New York State Dept. of Fin. Servs., 169 AD3d 18, 169 AD3d 18, 34 [1st Dept 2019]). This factor, however, does not weigh in respondents' favor either. It would only be speculation to conclude that the reason the bills never passed was because the legislators concluded that the existing agency had sufficient authority to adopt the policy.
4. Did the agency use special expertise or competence in the field to develop the challenged regulation?
Technical expertise was clearly essential to develop the regulation that set forth the detailed protocols of how the DNA profiles of convicted offenders in the databank are tested and matched to samples provided by law enforcement to determine whether there is a familial match (9 NYCRR 6192.3). In fact, the subcommittee is comprised of a blue ribbon panel of experts in forensic science and other overlapping disciplines (Executive Law § 995-b[13][a]). The application of this factor, however, is largely neutral in our analysis because the skills s necessary to decide the underlying public policy issue of whether familial DNA searching of the databank should be permitted are not technical in nature (see Greater NY Taxi Assn., 25 NY3d at 612).
5. Are there any other considerations raised that are not covered by the Boreali factors?
The parties present competing argument about how respondents' earlier authorization and implementation of partial match searches influences our analysis of the issues in this case. Respondents argue that their adoption of partial DNA matches in 2010 demonstrates (and proves) that authorization of family DNA matches is likewise authorized under the Databank Act. The arguments in opposition, largely claim that partial and family DNA searches are fundamentally different because there is additional genetic testing to confirm or refute biological relatedness between the known individual in the DNA database and the unknown individual contributing the DNA evidence. Assuming, without deciding, that the two types of DNA [*14]matches have a certain parity, respondents' authority to promulgate the 2010 partial match regulation were never challenged in court. Although arguments about respondents' authority were raised in public hearings, no court proceeding was brought challenging their promulgation. Consequently, the existence of the partial match DNA regulation neither proves nor disproves the scope of respondents' authority to promulgate the Familial DNA regulation challenged in this case.
In consideration of the above relevant factors, we find that the overwhelming policy issues inherent in authorizing the use and limitations upon familial match searches of DNA information collected in the New York State databank warrants a conclusion that it is an inherently legislative function and that the challenged regulation cannot stand.
Because we find that respondents acted outside the scope of their authority in promulgating the familial DNA regulation, we need not reach petitioners' alternative argument that respondents acted arbitrarily and capriciously in otherwise enacting them.
Accordingly, the judgment of the Supreme Court, New York County (Shlomo S. Hagler, J.), entered October 20, 2020, denying the petition to, among other things, annul the Familial DNA Search (FDS) Regulations codified at 9 NYCRR 6192.1 and 6192.3 on October 18, 2017, effective the same date, and dismissing the proceeding brought under article 78, should be reversed, on the law, without costs, and the petition granted. The FDS regulations are vacated. The appeal from the order, same court and Justice, entered on or about March 27, 2020, dismissed, without costs, as subsumed in the appeal from the judgment.
All concur except Oing and Singh, JJ. who dissent in an Opinion by Singh J.




Singh, J. (dissenting)
 

I would reverse Supreme Court's threshold determination that petitioners have standing and dismiss the petition solely on those grounds. Petitioners are able to show neither injury in fact nor that their injury falls within the zone of interests sought to be protected by the DNA Database Act (the Act), which governs the collection of DNA from individuals convicted of a crime (Executive Law § 995 et seq.).
Petitioners are law abiding citizens. According to their verified petition, they have "never been arrested or convicted of any crime." Their sole connection to the regulations at issue here is that each has a brother who has been convicted. Thus, petitioners believe that the New York State DNA Databank (the Databank) contains their brothers' DNA profiles, but it is undisputed that the Databank does not contain their genetic material. Significantly, petitioners do not allege that law enforcement has approached them to provide a DNA sample or that they have been affected by the familial search rule. Instead, petitioners contend that they may, at some time in the future, be adversely affected by such a search. Petitioners surmise that, since their brothers' DNA is in the Databank, they are [*15]somehow at risk of "suspicionless searches" that are "directed to their DNA and personal genetic makeup."
These arguments betray a lack of understanding of how a familial search is conducted when sufficient DNA is found at the crime scene. The regulations will not affect petitioners unless many rare conditions are all independently satisfied. First, the DNA must appear to have a direct connection with the perpetrator of murder, a violent or felony sex offense, kidnapping, arson, terrorism, or another crime presenting a significant risk to public safety (9 NYCRR 6192.3[h][1], [h][3][ii]). After other reasonable investigation (id. 6192.3[h][2][i]), or under exigent circumstances (id. 6192.3[h][2][ii]), a prosecutor and investigative agency may jointly apply for a familial DNA search (id. 6192.3[i]). The application must be reviewed by the Division of Criminal Justice Services, the administrator of the DNA databank, and the commissioner of the Division of Criminal Justice Services (id.). The request must be withdrawn if a suspect is identified by other means before the search is complete (see id. 6192.3[k][2][iv]).
Once an application is approved, the search must be conducted using validated software (see id. 6192.3[j][1]). The result must be at least 5,000 — or, for some DNA testing kits, 10,000 — times more likely than not to be from a relative of the contributor of the DNA stored in the databank (see id. 6192.3[j][2], R855). Those results may be excluded by additional testing, such as the Y-STR testing that is required for male suspects (see id. 6192.3[j][3], [k][1]). When the results are released, the requestor must be informed that the DNA profile could not have come from the named offender and is not a definitive statement of a familial relationship (see id. 6192.3[k][1]). The requestors must be properly trained to evaluate the results and to protect the privacy of unknown family members (see id. 6192.3[k][2]).
In short, the search would not include petitioners' genetic material. Rather, the search would turn up a name of a person in the DNA bank — not of either petitioner — which could be used by the investigative authorities to conduct a follow up investigation. Thus, petitioners' concern of suspicionless searches is too speculative and hypothetical to support standing.[FN10]
The standing doctrine is not a mere technicality. It is a gatestop to courts from issuing advisory opinions — which "is not merely a question of judicial prudence or restraint; it is a constitutional command" (New York Pub. Interest Research Group v Carey, 42 NY2d 527, 529 [1977], citing Self-Insurer's Assn. v State Indus. Commn., 224 NY 13, 16 [1918] [Cardozo, J.]) — by ensuring that the dispute comes before it "in a form traditionally capable of judicial resolution" (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761,772-773 [1991], quoting Schlesinger v Reservists Comm. to Stop the War, 418 US 208, 220-221 [1974]). Standing also furthers important prudential [*16]limitations on a court's role, including "a ban on adjudication of generalized grievances more appropriately addressed by the representative branches" (id. at 773). The courts have adopted a two-part test to further these interests. Petitioners fail both parts.
First, a party must show that it has suffered "an injury in fact" (Matter of Mental Hygiene Legal Serv. v Daniels, 33 NY3d 44, 50 [2019]). This requires showing that "the party has an actual legal stake in the matter being adjudicated and has suffered a cognizable harm that is not tenuous, ephemeral, or conjectural" (id. [internal citations and quotation marks omitted]). Yet tenuous, ephemeral conjecture is all that petitioners have presented. The attenuated risk that DNA resembling petitioners' may meet the stringent requirements for familial DNA searching does not confer standing (see Roberts v Health & Hosps. Corp., 87 AD3d 311, 319 [1st Dept 2011][finding purported risk "far too speculative and hypothetical to even approach the 'injury-in-fact' requirement"]; Cubas v Martinez, 33 AD3d 96, 103 [1st Dept 2006] ["Where the harm sought to be enjoined is contingent upon events which may not come to pass, the claim to enjoin the purported hazard is nonjusticiable as wholly speculative and abstract"], quoting Matter of N.Y. State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo, 64 NY2d 233, 240 [1984]; see also City of Los Angeles v Lyons, 461 US 95, 108 [1983] [standing is not established by speculation that the plaintiff would be affected]).
An investigation will not necessarily lead to prosecution, arrest, or even any contact with police. Indeed, the majority concedes that a targeted individual may never learn of the familial search. This asserted risk of injury is too remote to constitute an injury in fact (see Bravo v State of New York, 129 AD3d 488, 489 [1st Dept 2015] [finding no standing to challenge criminal statute by a plaintiff who believed herself at risk of arrest but did not allege a "credible threat of prosecution"], quoting McCollester v City of Keene, N.H., 668 F2d 617, 619 [1st Cir 1982]; see also Police Benevolent Assn. of N.Y. State Troopers, Inc. v Division of N.Y. State Police, 43 AD3d 125, 129-130 [3d Dept 2007] [finding no standing where challenged policy was not reasonably certain to affect the plaintiffs and, if it did, was not reasonably certain to result in criminal charges]). Lino v City of New York did not, as petitioners and the majority contend, convert the possibility of injury into an injury in fact. In Lino, the plaintiffs had been arrested by police officers under NYPD's "stop and frisk" policy, but the charges against them were dismissed (101 AD3d 552, 553 [1st Dept 2012]). NYPD nevertheless maintained records of the encounter, including plaintiffs' names and addresses, in a central database (id. at 553-554). The plaintiffs sought to seal the records, arguing that disclosure of the records could harm their employment [*17]prospects or subject them to future investigation. We found an injury in fact, because the records were unsealed and because the database itself was an improper disclosure of the records (id. at 555-556). Thus, in Lino, the harm arose from actual police conduct by NYPD's retention of the records. By contrast, here, petitioners do not point to any action law enforcement has taken towards them but merely conjecture thatpolice action may be taken against them in some unspecified future case.
Next, turning to the second prong of the standing test, any injury "must fall within the zone of interests or concerns sought to be promoted or protected by the statutory provision under which the agency has acted" (Roberts, 87 AD2d at 318, quoting New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d 207, 211 [2004]). This requirement "ensures that a group or individual 'whose interests are only marginally related to, or even inconsistent with, the purposes of the statute cannot use the courts to further their own purposes at the expense of the statutory purposes'" (id. at 319, quoting Society of Plastics, 77 NY2d at 774).
The majority does not — and cannot — explain why petitioners have satisfied this requirement. Petitioners rely on statutory provisions that require only those convicted of and sentenced for a felony or misdemeanor to provide DNA samples (Executive Law §§ 995[7], 995-c[3]) and requiring records to be expunged upon reversal or vacatur of conviction (id. § 995-c[9][a]). Since petitioners have no DNA in the Databank and the familial search regulations do not compel them to provide their DNA, they fall outside the zone of interests provided by the Act.
The Act governs the collection of a person's DNA, as well as the subsequent maintenance and disclosure of information obtained from DNA. The interests to be protected are the interests of those whose DNA has been or will be collected (see Roberts, 87 AD3d at 319-320 [finding injury outside the zone of interests when regulatory scheme was primarily intended to benefit another group]). Some "incidental" benefit to other parties does not confer standing on those other parties (id. at 320). Moreover, the Act expressly permits the use of DNA records for law enforcement purposes (Executive Law § 995-c[6][a]; see Bloomfield v Cannavo, 123 AD3d 603, 605 [1st Dept 2014] [finding no standing to challenge procedure that the statute "plainly contemplates"]). The majority cites no statutory provisions implicating the privacy of those whose DNA has not been collected.
The majority also finds that petitioners derive standing from the regulations' own concern for family members' privacy. It argues that the petitioners fall within the zone of interests protected by the challenged regulations, which balance family members' privacy rights against the investigative needs of law enforcement. This attempt to bootstrap standing based on family members' privacy interest finds no support in our jurisprudence. A petitioner [*18]must fall within the zone of interests for "the statutory provision under which the agency has acted" (Roberts, 87 AD2d at 318 [emphasis added]). In implementing the family search rule, the Commission on Forensic Science could not act under the very rule it was promulgating. Rather, it derived its authority from the Act. In fact, the legislature specifically delegated the authority to administer the Databank to the Commission, with the assistance of the DNA subcommittee, to determine the structure of the Databank and how searches are to be conducted. The fact that petitioners' family members have DNA in the Databank does not bring petitioners within the zone of interests to be protected by the Act.
The majority's apparent basis for disregarding the standing requirements is its concern that the four-month statute of limitations would render the Commission's decision unreviewable. Perhaps this concern would warrant an expansion of standing under some circumstances (see Matter of Association for a Better Long Is., Inc. v New York State Dept. of Envtl. Conservation, 23 NY3d 1, 8 [2014]). For example, the Court of Appeals found a milk producer had standing to challenge a competitor's license to sell milk, because no other party could claim to be harmed and the absence of any challenge would undermine the statute's purpose of maintaining healthy competition (Matter of Dairylea Coop. v Walkley, 38 NY2d 6, 11-12 [1975]).[FN11] What it does not do is obviate the need for standing, especially here.
Rather than await a challenge in a criminal proceeding, the majority chooses to confer standing on anyone who may conceivably have been affected by an agency's decisions. It is well established that evidence obtained in violation of the New York Constitution is not admissible in a criminal case (see e.g. People v Mendoza, 82 NY2d 415, 425 [1993] ["The Legislature has determined that defendants should have fair pretrial procedures to address alleged constitutional violations"]; People v Payton, 51 NY2d 169, 175 [1980] ["evidence will be suppressed if it was seized by the police . . . pursuant to an order expressly authorized by a statute later determined to be unconstitutional"], citing Berger v New York, 388 US 41 [1967]). Respondents do not argue otherwise. The majority nevertheless argues — although petitioners have abandoned their Fourth Amendment challenge — that a defendant could not challenge a familial search on Fourth Amendment grounds. Grounds for suppression, however, are not limited to violations of the Fourth Amendment (see e.g. People v Bright, 71 NY2d 376 [1988] [affirming suppression of evidence on grounds that statute authorizing arrest was unconstitutionally vague]; see generally CPL 710.20). The majority also fails to cite any authority that a defendant may not challenge the validity of regulations in moving to suppress evidence. Thus, while petitioners cannot challenge the collection or testing of another person's DNA, criminal defendants may move [*19]to exclude evidence derived from their own DNA at a crime scene, including by challenging the regulations at issue. In my view, this issue should be addressed in the context of an actual dispute and not based on a hypothetical, wholly speculative harm that is unlikely to occur.
Judgment Supreme Court, New York County (Shlomo S. Hagler, J.), entered October 20, 2020, denying the petition to, among other things, annul the Familial DNA Search (FDS) Regulations codified at 9 NYCRR 6192.1 and 6192.3 on October 18, 2017, effective the same date, and dismissing the proceeding brought under article 78, reversed, on the law, without costs, and the petition granted. The FDS regulations are vacated. The appeal from the order, same court and Justice, entered on or about March 27, 2020, dismissed, without costs, as subsumed in the appeal from the judgment.
Opinion by Gische, J.P. All concur except Oing and Singh, JJ. who dissent in an Opinion by Singh J.
Gische, J.P., Webber, Oing, Singh, Higgitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: May 5, 2022



Footnotes

Footnote 1:See e.g. https://www.criminaljustice.ny.gov/crimnet/ojsa/comparison-population-arrests-prison-demographics/2019%20Population%20Arrests [last accessed 2/02/22], which reports New York State 2019 arrests broken down by race and ethnicity.

Footnote 2: It is important to distinguish the New York State databank from DNA databanks that are maintained by private companies that use similar DNA science for ancestry tracing. The NYS DNA databank is completely separate and involuntary on the part of its participants. While open source search of DNA databanks by law enforcement may raise constitutional and/or public policy issues, those issues are not implicated in this proceeding (see New York Times, May 31, 2021, Huges V., Two New Laws Restrict Police Use of DNA Search Method, www.nytimes.com/2021/05/31/science/dna-police-laws.html).

Footnote 3: During the hearings certain objections were raised about the agencies authority to promulgate regulation about the use of partial matches. The agency rejected these objections. Unlike the circumstance here, the issue of respondent's authority was never tested in court and the authorization for partial matching remains intact.

Footnote 4: These represent anecdotal examples only and are not a complete listing of crime investigations in which familial DNA has proven to be useful.

Footnote 5: ICF, with the support of the National Institute of Justice, conducted a study on familial DNA policies and practices in the United States. The study was in response to the fact that much of the information concerning use of family DNA stemmed from anecdotal accounts and scholarly articles posed by stakeholders. The authors published their findings in June 2017. Although the views expressed are those of the authors and do not necessarily reflect the official position of the U.S. Department of Justice, they are informative (see Field, M & Debus-Sherrill, S, Study of Familial DNA Searching Policies and Practices, National Survey of CODIS Laboratories Brief, June 2017). Notwithstanding that the laboratories reported that successful prosecutions using either family or partial DNA matches were rare, it was still believed to be a useful tool in solving crimes.

Footnote 6: The DNA profile must be associated with one of these crimes:
(i) a Penal Law article 125 felony offense, other than one defined in Penal Law sections 125.40 or 125.45; or
(ii) a Penal Law article 130 offense that is defined as a violent felony offense pursuant to Penal Law section 70.02; or
(iii) a class A felony offense defined in article 130, 135, 150 or 490 of the Penal Law; or
(iv) a crime presenting a significant public safety threat.

Footnote 7: As Supreme Court observed, petitioners bear [a peculiar risk of being approached by an investigating agency in connection with an investigation aided by the challenged regulation], as do other close relatives of persons whose DNA is stored in the Database, a risk not shared by the general population.

Footnote 8: It bears mention that respondent DCJS advocated a different legal position in Aufiero and prevailed in opposing an Article 78 challenge to regulatory action it took, based upon the petitioner's failure to commence the proceeding within the four-month statute of limitations set forth in CPLR 217.
Footnote 9: Although the dissent, citing CPL 710.20, states that suppression hearings are not limited to Fourth Amendment challenges, we note that CPLR 710.20(1) is a statutory codification of unlawful search and seizure. The other subdivisions have no application to the facts of this proceeding.

Footnote 10: Six months after the policy became effective, on April 24, 2018, only 12 applications for a familial search had been submitted to the Acting Commissioner of the Division of Criminal Justice Services, who had only approved 9 of them.

Footnote 11: Nor does Dairylea negate the injury-in-fact requirement. In Dairylea, unlike here, there was "no issue as to the deleterious effect on Dairylea of the commissioner's action" (38 NY2d at 9). As the Court observed, "where there is . . . lack of injury in fact," standing will be denied (id. at 11).