[51 NE3d 512, 32 NYS3d 1]

In the Matter of NYC C.L.A.S.H., Inc., Appellant, v New York State Office of Parks, Recreation and Historic Preservation et al., Respondents.

Argued February 10, 2016; decided March 31, 2016

*Joshpe Law Group LLP*, New York City (*Edward A. Paltzik* of counsel), and *Law Offices of Yan Margolin*, New York City (*Yan Margolin* of counsel), for appellant. ▮▮▮▮▮

*Eric T. Schneiderman, Attorney General*, Albany (*Victor Paladino, Barbara D. Underwood* and *Andrea Oser* of counsel), for respondents.

**OPINION OF THE COURT**

FAHEY, J.

Broadly stated, this appeal presents the question whether one may smoke in any outdoor area of a location under the jurisdiction of respondent-defendant New York State Office of Parks, Recreation and Historic Preservation (OPRHP). It is arguable that allowing a smoking ban in such areas is to support governmental interference in the public's private affairs, as well as to approve of the restraint of personal autonomy and the right to make the "wrong" choice.[1] To state the principal question on this appeal so broadly, however, is to state it incorrectly. The exercise of an individual right is not limitless. We may measure its limits against the damage it does to our neighbors.

OPRHP is the administrative agency responsible for overseeing state parks, state historic sites, and various beaches and other recreational facilities and areas in this state. In Parks, Recreation and Historic Preservation Law § 3.09 (2), the legislature specifically charged OPRHP with "[o]perat[ing] and maintain[ing], either directly, or by contract, lease or license,

---

1. Twentieth century British writer G.K. Chesterton observed that "[t]he free man owns himself. He can damage himself with either eating or drinking; he can ruin himself with gambling. If he does he is certainly a damn fool . . . but if he may not, he is not a free man any more than a dog" (Broadcast Talk [June 11, 1935]). A reasonable mind may view that observation as nipping at the edges of this case.

such historic sites and objects, parks, parkways and recreational facilities." In section 3.09 (5) of the same law, the legislature instructed OPRHP to "[p]rovide for the health, safety and welfare of the public using facilities under its jurisdiction." The main issue on this appeal, accurately articulated, is whether OPRHP and its Commissioner, respondent-defendant Rose Harvey,[2] acted within the confines of those legislative edicts in enacting a regulation prohibiting the smoking of tobacco or any other product in certain outdoor locations under the jurisdiction of OPRHP. We conclude that OPRHP did, and we therefore affirm the Appellate Division order.

## Facts

Petitioner-plaintiff, NYC C.L.A.S.H., Inc. (CLASH), is a nonprofit organization dedicated to advancing, promoting, and protecting the interests of smokers. As noted, OPRHP manages state parks and similar locations and, in furtherance of those duties, OPRHP bears responsibility for developing and updating regulations that implement the PRHPL (*see* PRHPL 3.09 [8]). On February 27, 2013, OPRHP announced the adoption of the regulation now embodied in 9 NYCRR 386.1. That rule, in relevant part, prohibits smoking in each state park located in New York City, as well as in other designated areas under the jurisdiction of OPRHP.

According to the record, OPRHP oversees 179 state parks, as well as 35 historic sites and other facilities, where it provides recreational opportunities and educational programming to more than 58 million annual visitors. The record reflects that the rule renders seven relatively small state parks in New York City smoke-free, subject to some limited exceptions. Other outdoor locations under the jurisdiction of OPRHP are subject to limited restrictions that OPRHP anticipates will result in the designation of less than five percent of the approximately 330,000 acres in the state park system as smoke-free.

CLASH commenced this hybrid CPLR article 78 proceeding and declaratory judgment action challenging the rule as, among other things, "unconstitutional and in violation of the separation of powers doctrine." Supreme Court granted the petition insofar as it "declared that 9 NYCRR 386.1 is invalid as violative of the separation of powers doctrine" (41 Misc 3d 1096, 1101 [Sup Ct, Albany County 2013]). The Appellate Divi-

---

2. Respondents-defendants will be referred to in the singular as OPRHP.

sion, however, disagreed with that determination, ruling that the adoption of 9 NYCRR 386.1 "was [not] an unconstitutional exercise of authority by OPRHP" (125 AD3d 105, 107 [3d Dept 2014]) inasmuch as "OPRHP . . . acted within its competence and authority by regulating the smoking activity of patrons at its parks and facilities" (*id.* at 111).[3] CLASH appeals to this Court as of right (*see* CPLR 5601 [b] [1]), and we now affirm the Appellate Division order.

## Law

" 'The concept of the separation of powers is the bedrock of the system of government adopted by this State in establishing three coordinate and coequal branches of government, each charged with performing particular functions' " (*Matter of Soares v Carter*, 25 NY3d 1011, 1013 [2015], quoting *Matter of Maron v Silver*, 14 NY3d 230, 258 [2010]). A typical point of dispute in this area is the legislature's delegation to an agency of the authority to administer by rule a statute as enacted by the legislature (*see Matter of Levine v Whalen*, 39 NY2d 510, 515 [1976]; *see also Matter of Campagna v Shaffer*, 73 NY2d 237, 242 [1989]). If a rule exceeds the parameters of the power granted by the legislature to the enacting agency—that is, "if an agency was not delegated the authority to [establish the] rule[ ], then it would usurp the authority of the legislative branch by enacting th[at] [regulation]" (*Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn.*, 25 NY3d 600, 608 [2015]). Consequently, "[t]he [overlapping] issues of delegation of power and separation of powers . . . are often considered together" (*id.*).

*Boreali v Axelrod* (71 NY2d 1 [1987]) is the touchstone for determining whether agency rulemaking has exceeded legislative fiat. There we held "that the Public Health Council [PHC] overstepped the boundaries of its lawfully delegated authority when it promulgated a comprehensive code to govern tobacco smoking in areas that are open to the public" (*id.* at 6). More specifically, we concluded that the PHC

> "usurped the . . . role [of the legislature] and thereby exceeded its legislative mandate, when,

---

**3.** The Appellate Division also concluded that the rule is not arbitrary and capricious (*id.* at 111-112), but we do not address that point herein. CLASH has abandoned that point inasmuch as it acknowledges in its main brief on this appeal that it does not dispute that question (*see generally JF Capital Advisors, LLC v Lightstone Group, LLC*, 25 NY3d 759, 766 n 2 [2015]).

following the Legislature's inability to reach an acceptable balance [on the question of tobacco smoking in public areas], the [PHC] weighed the concerns of nonsmokers, smokers, affected businesses and the general public and, without any legislative guidance, reached its own conclusions about the proper accommodation among those competing interests" (*id.*).

Underlying the action challenged in *Boreali* was "[the] growing concern about the deleterious effect of tobacco smoking," which, in 1975, led the legislature to "restrict[ ] smoking in certain designated areas, specifically, libraries, museums, theaters and public transportation facilities" (*id.* at 6-7, citing L 1975, ch 80, codified at Public Health Law, former art 13-E, §§ 1399-o—1399-q). "Efforts during the same year to adopt more expansive restrictions on smoking in public places were, however, unsuccessful" (*Boreali*, 71 NY2d at 7).[4] Moreover, between 1975 and 1987 "some 40 bills on the subject [were] introduced in the Legislature . . . , [but] none . . . passed both houses" (*id.*). Consequently, in 1986 and 1987, the PHC "took action of its own" and "promulgated [a] set of regulations prohibiting smoking in a wide variety of indoor areas that are open to the public, including schools, hospitals, auditoriums, food markets, stores, banks, taxicabs and limousines" (*id.*).

Despite our recognition "that th[e] case present[ed] no question concerning the wisdom of the challenged regulations, the propriety of the procedures by which they were adopted or the right of government in general to promulgate restrictions on the use of tobacco in public places" (*id.* at 8), we concluded that the regulations were not properly adopted inasmuch as "the difficult-to-define line between administrative rule-making and legislative policy-making ha[d] been transgressed" (*id.* at 11). We were persuaded "that the PHC [had] exceeded the scope of the authority properly delegated to it by the Legislature" (*id.* at 13) by the presence of four "coalescing circumstances" (*id.* at 11).

As they since have been distilled by this Court, the circumstances to be considered are whether (1) "the agency did more than 'balanc[e] costs and benefits according to preexisting

---

4. Those failed efforts considered such places as school auditoriums, sports arenas, commercial stores, public elevators, school or college classrooms, and public areas of health care institutions (*see id.*).

guidelines,' but instead made 'value judgments entail[ing] difficult and complex choices between broad policy goals' to resolve social problems" (*Greater N.Y. Taxi Assn.*, 25 NY3d at 610, quoting *Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene*, 23 NY3d 681, 698 [2014]; *see Boreali*, 71 NY2d at 11-12); (2) "the agency merely filled in details of a broad policy or if it 'wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance' " (*Greater N.Y. Taxi Assn.*, 25 NY3d at 611, quoting *Boreali*, 71 NY2d at 13); (3) "the legislature has unsuccessfully tried to reach agreement on the issue, which would indicate that the matter is a policy consideration for the elected body to resolve" (*Greater N.Y. Taxi Assn.*, 25 NY3d at 611-612, citing *Boreali*, 71 NY2d at 13); and (4) "the agency used special expertise or competence in the field to develop the challenged regulation[ ]" (*Greater N.Y. Taxi Assn.*, 25 NY3d at 612, citing *Boreali*, 71 NY2d at 13-14).

Our statement of the relevant principles of law does not end with the articulation of the *Boreali* factors. Those considerations, we have observed, are not to be applied rigidly (*Matter of New York Statewide Coalition of Hispanic Chambers of Commerce*, 23 NY3d at 696). In fact, they "are not mandatory, need not be weighed evenly, and are essentially guidelines for conducting an analysis of an agency's exercise of power" (*Greater N.Y. Taxi Assn.*, 25 NY3d at 612). Indeed, "we treat the circumstances as overlapping, closely related factors that, taken together, support the conclusion that an agency has crossed th[e] line [into legislative territory]" (*Matter of New York Statewide Coalition of Hispanic Chambers of Commerce*, 23 NY3d at 696-697). We also "center [any *Boreali* analysis] on the theme that 'it is the province of the people's elected representatives, rather than appointed administrators, to resolve difficult social problems by making choices among competing ends' " (*id.* at 697, quoting *Boreali*, 71 NY2d at 13).

## Analysis

Against that backdrop, and based on the following review of the *Boreali* factors, we conclude that OPRHP acted within the confines of the authority delegated to it by the legislature in enacting the disputed rule (9 NYCRR 386.1).

## A.

As noted, the first *Boreali* "factor is whether the agency [here, OPRHP] did more than 'balanc[e] costs and benefits according to preexisting guidelines,' but instead made 'value judgments entail[ing] difficult and complex choices between broad policy goals' to resolve social problems" (*Greater N.Y. Taxi Assn.*, 25 NY3d at 610, quoting *Matter of New York Statewide Coalition of Hispanic Chambers of Commerce*, 23 NY3d at 698; *see Boreali*, 71 NY2d at 11-12). *Boreali* specifically described this factor as whether the agency has "constructed a regulatory scheme laden with exceptions based solely upon economic and social concerns" (*id.* at 11-12).

With respect to this consideration, CLASH essentially contends that OPRHP improperly attempted to discourage certain adult behavior, just as the New York City Board of Health did in the "sugary drinks" case (*see Matter of New York Statewide Coalition of Hispanic Chambers of Commerce*, 23 NY3d at 699), and that "OPRHP's efforts to find middle ground between park patrons who smoke and [those] who [do not] evidences policy-making designed to strike a balance between competing considerations." Such actions, CLASH posits, are "the hallmark of the improper agency policy-making identified in *Boreali*" and tilt the first *Boreali* factor against OPRHP. Those contentions, however, are not properly before us inasmuch as they are raised for the first time on appeal (*see generally Bingham v New York City Tr. Auth.*, 99 NY2d 355, 359 [2003]). Before the trial court, CLASH asserted that the first *Boreali* factor is not relevant to this proceeding (*see* 125 AD3d at 109 n 3), and before the Appellate Division CLASH contended that this factor weighs in its favor because OPRHP gave improper consideration to *economic* concerns (*see id.* at 109). Now, CLASH improperly contends for the first time that the first *Boreali* factor weighs in its favor because OPRHP gave undue weight to *policy* considerations inasmuch as it attempted to reach a compromise between the competing interests of smokers and non-smokers, and we decline to reach that contention.[5]

---

5. Although we do not reach the merits of this contention, we note that the "sugary drinks" case is easily distinguishable from this matter. In the "sugary drinks" case we held "that the New York City Board of Health, in adopting the 'Sugary Drinks Portion Cap Rule,' exceeded the scope of its regulatory authority" inasmuch as it chose "among competing policy goals,

## B.

The second *Boreali* factor is fairly characterized as the tabula rasa consideration. With respect to this factor we assess whether the agency "merely filled in details of a broad policy or if it 'wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance' " (*Greater N.Y. Taxi Assn.*, 25 NY3d at 611, quoting *Boreali*, 71 NY2d at 13).

According to CLASH, 9 NYCRR 386.1 is a comprehensive anti-smoking measure written by OPRHP on a blank canvas with neither legislative direction nor legislative blessing. We disagree. OPRHP correctly notes that, at the time *Boreali* was decided, the legislature had never previously articulated any policy with respect to indoor smoking (*see Campagna*, 73 NY2d at 243 ["A key feature of (*Boreali*) was that the Legislature had never articulated a policy regarding the public smoking controversy"]). Here, by contrast, the legislature *has* spoken against secondhand smoke (*see* Public Health Law art 13-E, as added by L 1989, ch 244 [enacted after *Boreali*; regulating smoking in certain public areas]). In Public Health Law § 1399-o (1), the legislature prohibited smoking in various indoor areas. In subdivisions (2) and (4) of the same section the legislature interdicted smoking in outdoor areas including parts of certain railroad stations, grounds of hospitals and

without any legislative delegation or guidance" (*Matter of New York Statewide Coalition of Hispanic Chambers of Commerce*, 23 NY3d at 690). There, instead of banning sugary drinks entirely, the Board of Health decided to restrict portions by reducing their consumption size, thereby adopting a "compromise that attempted to promote a healthy diet without significantly affecting the beverage industry" (*id.* at 698). No such considerations are evident here inasmuch as the regulation at issue merely prohibits smoking in designated outdoor areas under the jurisdiction of OPRHP.

We also pause to note another point of distinction, namely, the dissimilarity of the facts of *Boreali* (71 NY2d 1) to those of this matter. As noted, in *Boreali* we held "that the [PHC] overstepped the boundaries of its lawfully delegated authority when it promulgated a comprehensive code to govern tobacco smoking in areas that are open to the public" (*id.* at 6). In doing so we concluded that the regulatory structure prohibited smoking in a wide variety of indoor areas open to the public (*see id.* at 7) pursuant to a scheme "*laden with exceptions* based solely upon economic and social concerns," including "exemptions . . . for bars, convention centers, small restaurants, and the like . . . based on financial hardship" (*id.* at 12 [emphasis added]). Those financial considerations had "no foundation in considerations of public health" and "demonstrate[d] the [PHC's] own effort to weigh the goal of promoting health against its social cost and to reach a suitable compromise" (*id.*). No such considerations are evident here inasmuch as the regulation at issue merely prohibits smoking in designated outdoor areas under the jurisdiction of OPRHP.

residential health care facilities, and within 100 feet of an entrance or exit to an after-school program. Although the legislature precluded the Department of Health from "promulgat[ing] any rules or regulations that create, limit or enlarge any smoking restrictions" contained in article 13-E of the Public Health Law (Public Health Law § 1399-x), that body also determined that "[s]moking may not be permitted where prohibited by any other law, rule, or regulation of any state agency . . . ." (§ 1399-r [3]).

So it is that the legislature made the policy decision to limit smoking in certain areas of the state, and left it to state agencies to act within the confines of that determination. The rule at issue merely fills in details of that policy (*see Greater N.Y. Taxi Assn.*, 25 NY3d at 611; *Boreali*, 71 NY2d at 13), and we agree with the Appellate Division's rejection of this "clean slate" contention (*see* 125 AD3d at 110).

## C.

The third *Boreali* factor may be cast as the consensus consideration. Pursuant to this factor we assess "whether the legislature has unsuccessfully tried to reach agreement on the issue, which would indicate that the matter is a policy consideration for the elected body to resolve" (*Greater N.Y. Taxi Assn.*, 25 NY3d at 611-612, citing *Boreali*, 71 NY2d at 13). We have said that "repeated failures by the Legislature to arrive at such an agreement do not automatically entitle an administrative agency to take it upon itself to fill the vacuum and impose a solution of its own," as it is the exclusive responsibility of the legislature "to resolve difficult social problems by making choices among competing ends" (*id.*).

In support of its contention that the third *Boreali* factor weighs in its favor, CLASH notes that, between its 2001-2002 and 2013-2014 sessions, the legislature considered and rejected 24 bills relating to outdoor smoking restrictions. That point is somewhat misleading inasmuch as only three of those bills passed one house of that bicameral body, and it is unclear if the others were subject to any real legislative debate. Additionally, many of those bills sought to ban outdoor smoking on a far larger scale, not limited to areas under the jurisdiction of OPRHP. In any event, CLASH maintains that, to date, the legislature has been unable to agree on a comprehensive approach to the question of outdoor smoking.

The analysis of this *Boreali* consideration arguably is close, but we agree with OPRHP that, under these circumstances, it

does not weigh in CLASH's favor (*see generally Rent Stabilization Assn. of N.Y. City v Higgins*, 83 NY2d 156, 170 [1993], *cert denied* 512 US 1213 [1994]). " 'Legislative inaction, because of its inherent ambiguity, affords the most dubious foundation for drawing positive inferences' " (*Matter of Oswald N.*, 87 NY2d 98, 103 n 1 [1995], quoting *Clark v Cuomo*, 66 NY2d 185, 190-191 [1985] [citations omitted]). OPRHP's point that the legislature could have declined to act on the subject bills in part because PRHPL 3.09 already delegates to OPRHP the authority to designate no-smoking areas is well-taken. The record reflects that the legislature's Administrative Regulations Review Commission, which examines rules with respect to, among other things, statutory authority and legislative intent, apparently reached the same conclusion inasmuch as it endorsed 9 NYCRR 386.1.

We also disagree with CLASH's contention that the now-pending bill S3760 (2015 NY Senate Bill S3760) shows a legislative intent to fill a "vacuum" in the area of outdoor smoking regulation. Although that bill specifically seeks to amend the Public Health Law "to prohibit smoking in all New York State parks," (Sponsor's Mem, 2015 NY Senate Bill S3760) it is a reaction to Supreme Court's ruling *in this case* and therefore is no more than a prophylactic measure introduced by an anti-smoking advocate protecting against the possibility that this matter is not resolved to that legislator's liking on appeal.

## D.

The fourth *Boreali* factor turns on agency knowledge, and specifically "whether the agency used special expertise or competence in the field to develop the challenged regulation[ ]" (*Greater N.Y. Taxi Assn.*, 25 NY3d at 612, citing *Boreali*, 71 NY2d at 13-14). We have suggested that this factor weighs against the agency unless its "technical competence was necessary to flesh out details of the broadly stated legislative policies" embodied in the law pursuant to which the regulation at issue was enacted (*Boreali*, 71 NY2d at 14).

CLASH contends that this factor tips in its favor because OPRHP's mandate is characterized in the PRHPL as merely that of parks management. Section 3.09 (2) of that law, however, provides that OPRHP shall *"[o]perate* and maintain [state] historic sites and objects, parks, parkways and recreational facilities" (emphasis added). Indeed, OPRHP is experienced in the function of the parks and like properties

under its purview, and the regulation at issue was driven by several concerns that are within the realm of its expertise. In the December 5, 2012 New York State Register, OPRHP announced a proposal that became the rule now at issue. There, OPRHP stated that "[t]he rule is needed to allow all of [its] patrons to enjoy the outdoors, breathe fresh air, walk, swim, exercise and experience [the] amenities and programs [of areas under OPRHP's jurisdiction] without being exposed to second-hand tobacco smoke and tobacco litter" (NY Reg, Dec. 5, 2012 at 11). OPRHP also stated that the rule would, among other things, improve enjoyment of state parks and historic sites; promote healthy lifestyles; provide operational savings; and fully implement voluntary no-smoking programs. Consequently, there is no merit to CLASH's contention that this *Boreali* factor weighs in its favor.

Conclusion

Recognizing that these factors need not be applied rigidly or weighed evenly, when considering them together we conclude that OPRHP did not make " 'value judgments entail[ing] difficult and complex choices between broad policy goals' to resolve social problems" (*Greater N.Y. Taxi Assn.*, 25 NY3d at 610, quoting *Matter of New York Statewide Coalition of Hispanic Chambers of Commerce*, 23 NY3d at 698), and did not cross "the difficult-to-define line between administrative rule-making and legislative policy-making" (*Boreali*, 71 NY2d at 11). In PRHPL 3.09 (2) and (5), the legislature delegated to OPRHP the authority to provide for the health, safety, and welfare of the public in connection with its oversight of the state park system. OPRHP acted within the confines of that delegated power and did not usurp the authority of the legislature by promulgating the regulation at issue. Accordingly, the Appellate Division order should be affirmed, with costs.

Chief Judge DiFiore and Judges Pigott, Rivera, Abdus-Salaam, Stein and Garcia concur.

Order affirmed, with costs.