People v Sargeant (2024 NY Slip Op 04580)

People v Sargeant

2024 NY Slip Op 04580

Decided on September 25, 2024

Appellate Division, Second Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on September 25, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

MARK C. DILLON, J.P.
VALERIE BRATHWAITE NELSON
WILLIAM G. FORD
LOURDES M. VENTURA, JJ.

2019-06979
 (Ind. No. 1354/17)

[*1]The People of the State of New York, respondent,
v
Derek Sargeant, appellant.

Patricia Pazner, New York, NY (Sarah B. Cohen of counsel), for appellant.
Melinda Katz, District Attorney, Kew Gardens, NY (Johnnette Traill and Danielle M. Boyle of counsel), for respondent.

DECISION & ORDER
Appeal by the defendant from a judgment of the Supreme Court, Queens County (Gene Lopez, J.), rendered May 13, 2019, convicting him of criminal possession of a weapon in the second degree, criminal possession of a weapon in the third degree, criminal possession of forgery devices (two counts), criminal possession of a weapon in the fourth degree (two counts), and unlawful possession of pistol ammunition, upon a jury verdict, and imposing sentence.
ORDERED that the judgment is affirmed.
The defendant was accused, by indictment, of having committed multiple felonies arising out of an alleged altercation between himself and a paid escort. The escort called 911 about having seen firearms in the defendant's basement, which the police, acting upon a search warrant, recovered.
The matter proceeded to trial in Queens County, with a trial jury and one alternate juror. A juror was discharged during trial for reasons unrelated to this appeal and the alternate juror was seated as a trial juror. The jury began deliberations on January 23, 2019. During that day, the defendant informed his counsel that he was not feeling well, but there was no request for an adjournment of the trial.
After deliberations had resumed the following morning, January 24, defense counsel requested that deliberations be suspended until the next morning. According to defense counsel, the defendant could not meaningfully participate in the proceedings as the defendant was experiencing a severe migraine headache and nausea. Defense counsel said that although the defendant had taken medication the previous day that had helped him to feel better, the medication was not working that day. The Supreme Court agreed to defense counsel's request and, at 12:40 p.m., adjourned further deliberations to the following day, January 25.
Juror No. 1 remained at the courthouse to have lunch and then went home. Upon arriving home, he was approached by a man at the gate outside his home who stated that "Derek Sargeant is innocent [and] he's being extorted." Thereafter, juror No. 1 telephoned an assistant district attorney who happened to be a friend, and who was otherwise uninvolved in the case, and [*2]described what had just occurred. That prosecutor advised juror No. 1 to contact the court. At approximately 2:35 p.m., juror No. 1 called the courtroom, spoke to the court clerk, and advised that he could no longer be impartial because of an occurrence. Not long after, the prosecutor whom juror No. 1 contacted called the court and advised that his friend, juror No. 1, had been approached by the defendant outside juror No. 1's home, and the prosecutor thereafter memorialized this information in an affirmation. The Supreme Court contacted the attorneys, informing them that it had been advised of an incident involving the defendant speaking to a juror at the juror's home that afternoon.
The Supreme Court conducted a Buford hearing (see People v Buford, 69 NY2d 290) the following day. Juror No. 1 gave testimony under oath regarding the incident. Juror No. 1 stated that after waiting for lunch to be delivered to the courthouse on the afternoon of January 24, he traveled home by car. Outside the front gate to juror No. 1's house, a man approached juror No. 1 and "[s]ome documents were pushed into [juror No. 1's] hand." The man "told [juror No. 1 that the defendant] is innocent" and was "being extorted." Asked how the man knew where the juror lived, the male answered, "[p]ublic records." Before leaving, the man told juror No. 1 that "[he] trusted [him]." Juror No. 1 described the man as being approximately the same height as juror No. 1, of average weight, and "dark-skinned, a little lighter than [him]" though juror No. 1 "could not tell [the man's] exact race." The man was wearing a hat, sunglasses, and a gray jacket with a high collar. Juror No. 1 was not sure if the man who approached him was the defendant. Juror No. 1 brought to court the documents, or some of the documents, that the man had presented to juror No. 1. The court described the documents as a copy of a search warrant, part of an order determining an omnibus motion, and a document bearing a detective's name. Juror No. 1 testified that after the incident, he contacted an acquaintance who worked as a prosecutor. Juror No. 1 did not recall telling that acquaintance that the man was the defendant. Juror No. 1 recalled telling his friend that the man was "someone like on behalf of [the defendant]." Juror No. 1 later contacted the court. The incident made juror No. 1 concerned for the safety of his family. Based on the incident, juror No. 1 could no longer be a fair and impartial juror. Following this testimony, the court discharged juror No. 1 on consent of the parties.
The People made an application to resume deliberations with an 11-person jury, and defense counsel made an application for a mistrial. The Supreme Court held the defendant's application in abeyance pending testimony from the prosecutor who was juror No. 1's friend.
That prosecutor testified that after receiving a text from juror No. 1 the previous afternoon, January 24, the prosecutor called juror No. 1. Juror No. 1 disclosed that he was a sitting juror on a case and that when he arrived home from court that day, "the defendant approached him and attempted to hand him some documents." The prosecutor "asked [juror No. 1] like the defendant from the case and [juror No. 1] said, yes." According to the prosecutor, juror No. 1 seemed nervous. The prosecutor told juror No. 1 to contact the court. Following this testimony, the parties renewed their applications. The defendant was not willing to waive his right to a 12-person jury.
At the next court appearance, the Supreme Court denied the defendant's application for a mistrial and granted the People's application to resume deliberations. The court stated, "I have no doubt that it was the defendant who confronted juror number one at his home. Moreover, it is of no moment that it may have been another. If it was not the defendant, then it was another who acted at the defendant's direction to confront juror number one at his home. The words used by the defendant were intended to improperly influence juror number one while in the midst of his deliberations.
"Moreover, the documents thrust upon juror number one were part of his  of the defendant's discovery. Documents that the defendant had access to. There is no reason to think that someone not acting at defendant's direction could have these documents, if not the defendant himself, and use them in the manner described by juror number one particularly in the context of the statements made by the defendant or the person acting at his direction.
"At the beginning of the trial the Court told the parties and the jury that our day would end no later than 4:30 p.m. each day they were in session.
"Generally we ended each day between 4:00 and 4:30 except for January [24] when we recessed at 12:40 p.m. To make his claimed illness more credible, the defendant complained to his counsel the day before about his migraine attack. The defense attorney then made the Court aware that the defendant had complained to him the day before. The request to recess early on January 24 appeared all the more credible to his attorney and to the Court since the migraine attack had not only not abated by taking medicine, but had gotten worse because the medication made him nauseous.
"Thus the defendant had an opportunity to confront juror number one on the afternoon of January 24. I find juror number one's indication of the defendant to [a Kings County prosecutor] was unequivocal and reliable.
"Moreover, juror number one's description of the height, weight and skin tone and physical appearance of the man who confronted him matched that of the defendant. The overwhelming fear for the safety of his family is in my view a compelling reason that explains juror number one's equivocation of directly identifying the defendant in court on January 25.
"The defendant by his conduct placed juror number one in an untenable position. No [c]ourt can countenance any attempt to corrupt the deliberative process of a jury. To declare a mistrial because of the defendant's misconduct is [ ]not a deterrence, but simply acquiescing to his misconduct. In this case the defendant forfeited his right to a trial by twelve jurors. This trial will now continue with eleven jurors."
After the trial was completed, the Supreme Court also issued a written decision on the applications (see People v Sargeant, 64 Misc 3d 487 [Sup Ct, Queens County]).
Jury deliberations resumed following the Supreme Court's decision on the applications. Ultimately, the jury convicted the defendant of criminal possession of a weapon in the second degree, criminal possession of a weapon in the third degree, criminal possession of forgery devices (two counts), criminal possession of a weapon in the fourth degree (two counts), and unlawful possession of pistol ammunition, while acquitting him of criminal possession of a weapon in the second degree (two counts), criminal possession of a weapon in the third degree, criminal possession of forgery devices, criminal obstruction of breathing or blood circulation, and criminal possession of a weapon in the fourth degree. The court rendered a judgment of conviction and imposed sentence. The defendant appeals.
On appeal, the defendant does not take issue with the Supreme Court's finding that he was the person who, in fact, approached juror No. 1 at the juror's home on the date and time in question. The defendant's main contention is that his conviction by an 11-person jury deprived him of his federal and state constitutional rights to a 12-person jury, necessitating reversal. We reject this contention.
The Sixth Amendment to the United States Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury" (US Const Amend VI). In Duncan v Louisiana (391 US 145), the Supreme Court of the United States held that the Fourteenth Amendment guarantees a right to trial by jury in all criminal cases that, were they to be tried in federal court, would come within the Sixth Amendment's guarantee.
In Williams v Florida (399 US 78, 86), the Supreme Court of the United States considered whether the constitutional guarantee of trial by jury necessarily required trial by exactly 12 persons, rather than some lesser number. The Court "h[e]ld that the 12-[person] panel is not a necessary ingredient of 'trial by jury,' and that respondent's refusal to impanel more than the six members provided for by Florida law did not violate petitioner's Sixth Amendment rights as applied to the States through the Fourteenth" (id.).
The purpose of a jury trial, according to the Supreme Court of the United States in [*3]Williams, was to prevent oppression by the government (see id. at 100). "Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his [or her] accuser of the commonsense judgment of a group of lay[people], and in the community participation and shared responsibility that results from that group's determination of guilt or innocence. The performance of this role is not a function of the particular number of the body that makes up the jury" (id.). The Court acknowledged that the number should probably be large enough to promote group deliberation, free from outside attempts at intimidation, and to provide a fair possibility for obtaining a representative cross-section of the community (see id.). "But we find little reason to think that these goals are in any meaningful sense less likely to be achieved when the jury numbers six, than when it numbers 12—particularly if the requirement of unanimity is retained. And, certainly the reliability of the jury as a factfinder hardly seems likely to be a function of its size" (id. at 100-101 [footnote omitted]).
The Williams Court explained that it did not "mean to intimate that legislatures can never have good reasons for concluding that the 12-[person] jury is preferable to the smaller jury, or that such conclusions—reflected in the provisions of most States and in our federal system—are in any sense unwise" (id. at 103 [footnote omitted]). "Legislatures may well have their own views about the relative value of the larger and smaller juries, and may conclude that, wholly apart from the jury's primary function, it is desirable to spread the collective responsibility for the determination of guilt among the larger group" (id.). The Court stated that its "holding does no more than leave these considerations to Congress and the States, unrestrained by an interpretation of the Sixth Amendment that would forever dictate the precise number that can constitute a jury" (id.).
While acknowledging that Williams "has some precedential authority," the defendant maintains that the United States Constitution protects the right to a 12-person jury, and that his federal right was violated. He also points to writings critical of Williams, such as Justice Gorsuch's dissent from the denial of a writ of certiorari in Khorrami v Arizona (____ US ____, 143 S Ct 22 [Gorsuch, J., dissenting]). There, in dissent, Justice Gorsuch concluded that "[f]or almost all of this Nation's history and centuries before that, the right to trial by jury for serious criminal offenses meant the right to a trial before 12 members of the community. In 1970, this Court abandoned that ancient promise and enshrined in its place bad social science parading as law. That mistake continues to undermine the integrity of the Nation's judicial proceedings and deny the American people a liberty their predecessors long and justly considered inviolable" (Khorrami, ____ US at ____, 143 S Ct at 27; see Cunningham v Florida, ____ US ____, 144 S Ct 1287 [Gorsuch, J., dissenting]). Dissents notwithstanding, Williams remains binding precedent on this Court. Thus, we reject the defendant's contention that his conviction by an 11-person jury deprived him of his federal constitutional right to a 12-person jury that would necessitate the reversal of his judgment of conviction.
The Supreme Court of the United States had further occasion to consider the issue in Ramos v Louisiana (590 US 83). In Ramos, the Court reversed a state conviction based on a 10-2 verdict on the ground that it violated the defendant's independent right to a unanimous verdict (see id. at 87, 93, 111). A fair reading of both Williams and Ramos leads to the conclusion that under federal law, the exact number of jurors hearing a felony trial is not quite as important as the necessity of the verdict being unanimous.
Although generally a trial jury consists of 12 persons in federal criminal practice, the federal rules allow for a verdict to be returned by a jury consisting of fewer than 12 persons. Federal Rules of Criminal Procedure rule 23(b)(1) provides that a jury consist of 12 persons "unless this rule provides otherwise." Federal Rules of Criminal Procedure rule 23(b)(2) provides that at any time before the verdict the parties may, with the court's approval, stipulate in writing that (a) the jury may consist of fewer than 12 persons or (b) a jury of fewer than 12 persons may return a verdict if the court finds it necessary to excuse a juror for good cause after the trial begins. More significantly, Federal Rules of Criminal Procedure rule 23(b)(3) provides that "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror."
Consistent with the foregoing rules, Federal Circuit Courts have upheld District Court decisions to excuse a deliberating juror and take a verdict from an 11-person jury where the District Court acted within its discretion in so doing (see e.g. United States v Paulino, 445 F3d 211, 225-226 [2d Cir] [District Court acted within its discretion in excusing deliberating juror due to ill health]; United States v Ruggiero, 928 F2d 1289, 1295-1296, 1300 [2d Cir] [District Court acted within its discretion in excusing deliberating juror who had been subjected to intimidation by two men in his driveway]; United States v Casamento, 887 F2d 1141, 1186-1187 [2d Cir] [District Court acted within its discretion in excusing deliberating juror whose daughter had received a threatening telephone call]).
We therefore conclude that under the circumstances of this case, the defendant's conviction by an 11-person jury is not violative of his federal constitutional rights. Parenthetically, while the Federal Rules of Criminal Procedure do not control in this case, we note that the Federal Rules of Criminal Procedure and federal authority would support the Supreme Court's decision to resume deliberations with an 11-person jury under these good cause circumstances.
We turn to the defendant's state constitutional claim. New York Constitution, article I, § 2 provides that: "Trial by jury in all cases in which it has heretofore been guaranteed by constitutional provision shall remain inviolate forever; but a jury trial may be waived by the parties in all civil cases in the manner to be prescribed by law. The legislature may provide, however, by law, that a verdict may be rendered by not less than five-sixths of the jury in any civil case. A jury trial may be waived by the defendant in all criminal cases, except those in which the crime charged may be punishable by death, by a written instrument signed by the defendant in person in open court before and with the approval of a judge or justice of a court having jurisdiction to try the offense. The legislature may enact laws, not inconsistent herewith, governing the form, content, manner and time of presentation of the instrument effectuating such waiver."
New York Constitution, article VI, § 18 provides, in part, that "Trial by jury is guaranteed as provided in article one of this constitution. The legislature may provide that in any court of original jurisdiction a jury shall be composed of six or of twelve persons and may authorize any court which shall have jurisdiction over crimes and other violations of law, other than crimes prosecuted by indictment, to try such matters without a jury, provided, however, that crimes prosecuted by indictment shall be tried by a jury composed of twelve persons, unless a jury trial has been waived as provided in section two of article one of this constitution."
Consistent with the State Constitution, CPL 270.05(1) provides that "[a] trial jury consists of twelve jurors, but 'alternate jurors' may be selected and sworn pursuant to section 270.30."
The Court of Appeals has held that "[t]he fundamental right to a jury trial guaranteed by the State Constitution includes the right to a jury of 12 " (People v Page, 88 NY2d 1, 3). Indeed, "express provisions of our Constitution should be vigilantly enforced and the rights they protect zealously guarded" (id. at 9-10). Nonetheless, subsequent to Page, the Court of Appeals, in People v Gajadhar (9 NY3d 438, 440), also held that the State Constitution "permits a defendant to consent to a deliberating jury of less than 12 individuals." Gajadhar included a vigorous dissent stating, in part, that "the clear and unambiguous language of article VI, section 18 dictates the requisite number of jurors. There is no language in the Constitution that permits a felony jury trial with fewer than 12 jurors. . . . The right to be tried by a jury of 12—unless waived in favor of a bench trial—is inviolate and cannot be waived" (id. at 452-453 [Ciparick, J., dissenting]).
Gajadhar is factually distinct from the instant case, as the Gajadhar defendant executed a written waiver in the manner that satisfied the State Constitution while the instant defendant refused to waive his right to a 12-person jury. Yet, the majority opinion in Gajadhar stands for the proposition that the state constitutional right to a 12-person jury is not absolute, since it can be waived.
In resuming deliberations with an 11-person jury rather than granting defense [*4]counsel's application for a mistrial, the Supreme Court determined that the defendant, by his misconduct, forfeited his right to a trial by 12 jurors. There is a distinction between a waiver of rights and a forfeiture of them. "Whereas waiver results from a knowing, voluntary and intelligent decision, forfeiture occurs by operation of law, based on objective facts and circumstances and without regard to defendant's actual state of mind" (People v Corley, 67 NY2d 105, 110).
A criminal defendant's constitutional rights may be forfeited by a defendant's conduct. A defendant's right to be present at a criminal trial is encompassed within the confrontation clauses of the State and Federal Constitutions (see US Const Amend VI; NY Const, art I, § 6; People v Parker, 57 NY2d 136, 139). Of particular relevance to this defendant's state constitutional claim, the right to be present at a criminal trial is guaranteed in the State Constitution by language in article I, § 6. Nonetheless, a defendant may, by his or her conduct, forfeit the right to be present at his or her trial (see e.g. People v George, 219 AD3d 502, 503 ["the record supports the court's determination, made after an inquiry, that the defendant's absence at the time his trial reconvened was deliberate and that his conduct unambiguously indicate[d] a defiance of the processes of law sufficient to effect a forfeiture of his right to be present"] [internal quotation marks omitted]; People v Baxter, 102 AD3d 805, 805 ["The record shows that the defendant forfeited his right to be present at trial by engaging in disruptive behavior, which caused his removal from the courtroom"]). Likewise, the right to counsel is guaranteed by both the Federal and State Constitutions (see US Const Amend VI; NY Const, art I, § 6; People v Arroyave, 49 NY2d 264, 270). It is specifically set forth in article I, § 6 of the State Constitution. Yet a defendant may, by her or his conduct, forfeit that right (see People v Shanks, 37 NY3d 244, 253 ["egregious conduct by [a] defendant[ ] can lead to a deemed forfeiture of the fundamental right to counsel, but only as a matter of extreme, last-resort . . . analysis" (internal quotation marks omitted)]; see e.g. People v Sloane, 262 AD2d 431 ["defendant forfeited his right to counsel by his persistent pattern of threatening, abusive, obstreperous, and uncooperative behavior with successive assigned counsel"]).
Of particular note to this appeal, the Court of Appeals has held that "'where it has been shown that the defendant procured the witness's unavailability through violence, threats or chicanery,' the defendant 'may not assert either the constitutional right of confrontation or the evidentiary rules against the admission of hearsay in order to prevent the admission of the witness's out-of-court declarations,' including the witness's grand jury testimony" (People v Smart, 23 NY3d 213, 220, quoting People v Geraci, 85 NY2d 359, 365-366). "This forfeiture rule . . . is based on sound public policy meant to prevent the defendant from taking advantage of his or her own wrongdoing and to protect the integrity of the proceedings by deterring the defendant from acting on the strong incentive to tamper with adverse witnesses" (id. at 220).
In our view, these public policy considerations apply with equal force to a defendant tampering with a trial juror as they do to a defendant tampering with an adverse witness. After all, at the heart of the right to a trial by jury in criminal cases is the "need to ensure that jury deliberations are conducted in secret, and not influenced or intruded upon by outside factors" (People v Rivera, 15 NY3d 207, 211). Moreover, we agree with the Supreme Court's conclusion in its written decision (see People v Sargeant, 64 Misc 3d at 496-498) that the clear and convincing evidence standard, applied to hearings to determine whether the defendant engaged in witness tampering (see People v Geraci, 85 NY2d at 366-368; Matter of Holtzman v Hellenbrand, 92 AD2d 405; People v Sirois, 92 AD2d 618) likewise applies to hearings to determine whether the defendant engaged in jury tampering.
Although the State Constitution provides in article VI, § 18 that a defendant is entitled to a 12-person jury absent the defendant's waiver, that language does not foreclose, and is not inconsistent with, a defendant's "forfeiture" of the right, just as in other contexts defendants have forfeited their constitutionally significant rights to confrontation, counsel, and presence in the courtroom. Our jury system is essential to the processes of the courts. A deliberate interference with not just one juror, but with the juror system itself to engineer mistrials at a strategically advantageous time, attacks the legitimacy and processes of the central functions of the judicial branch of governance.
Here, the Supreme Court, which was uniquely situated to view the witnesses, hear the testimony, and observe demeanor, properly determined that the People established by clear and convincing evidence that the defendant engaged in jury tampering.
Further, the circumstances of jury tampering in this instance were both devious and egregious. The defendant's deviousness is demonstrated by a number of facts in the record and findings by the Supreme Court. The defendant did not time his juror tampering for the portion of the trial when there was an alternate juror still available, but waited. During the course of the trial, the defendant was in a position to assess the strength of the evidence proffered by the People and the effectiveness of the attorneys' closing statements. The day prior to the tampering, the defendant "set up" his attorney by claiming that he did not feel well, to render more credible the later claim of illness. On the date of the tampering, the defendant feigned illness to manipulatively and successfully trick the court into a trial adjournment, with the unwitting advocacy of his counsel, knowing all the while that the defendant would use the opportunity to approach a juror outside of the courthouse. The defendant's scheme included a search of public records to learn of juror No. 1's residential address. Documents that the defendant intended to give to the juror were necessarily obtained and brought to the residence. The defendant was not ill, as he did not go to his own home to recuperate, nor did he see a doctor. Instead, he was lying in wait for juror No. 1 upon the juror's arrival home.
The defendant's conduct also was egregious. No doubt, the defendant heard at every recess the Supreme Court's standard admonishment to the jurors that they not discuss the case with any persons. The defendant's conduct was not a distant anonymous telephone call or a mysterious letter. He orchestrated an unexpected physical presence at juror No. 1's gate, invading the area of juror No. 1's home, speaking to him and handing over documents. Juror No. 1's description of the person at the gate by high-collared jacket, hat, and sunglasses, and who spoke to juror No. 1 in the third person, suggests an effort by the defendant at deception and disguise. Juror No. 1 seemed nervous while on the telephone with the friend the juror called shortly after the encounter. Most significantly, juror No. 1 was intimidated, as he testified at the Buford hearing that he was concerned for his family's safety. In the view of the Supreme Court, the intimidation was sufficient to cause juror No. 1 to stop short of specifically identifying the defendant as the individual who approached him, notwithstanding the juror No. 1's identification of the defendant during a telephone call to his friend and the physical descriptives which matched those of the defendant. The defendant sought to corrupt not only juror No. 1, but the validity of the ongoing trial and the legal process itself, for which jurors are so essential.
The state constitutional right to a 12-person jury is not absolute. Constitutional rights may be forfeited by a defendant's egregious conduct, and sound public policy considerations support forfeiture in instances of a defendant tampering with a twelfth juror during deliberations. Indeed, the credibility and security of jurors may be most at risk during deliberations, as in many cases, though not all, alternate jurors are discharged when the deliberative process begins.
Further, were we to determine that the Supreme Court, having found that the defendant confronted a trial juror at that juror's home and attempted to influence that juror during deliberations, had to declare a mistrial in the absence of additional jurors, we would be rewarding the defendant for his egregious misconduct. Future defendants may be incentivized and emboldened to engage in similar conduct designed to force a mistrial, or perhaps even successive mistrials, when witnesses may thereafter become unavailable, evidence may be lost or destroyed, memories may fade, or for other purposes of delay. The threat of a separate criminal prosecution for the misdemeanor offenses of tampering with a juror in the first and second degrees (Penal Law §§ 215.23, 215.25) provides too little disincentive, in our view, to dissuade a criminal defendant from engaging in such behavior, particularly when a defendant, like the defendant here, faces multiple felony charges and lengthy prison sentences. In other words, the calculation of cost and benefit may weigh in favor of the tampering, where the sentence for tampering may be minor compared to the length of the prison sentence potentially faced on a top count were jury deliberations to continue unmolested.
We hold that under these circumstances, the defendant's conviction by an 11-person jury did not deprive him of his state constitutional right to a 12-person jury. The defendant always had the right, until it was forfeited by him. The right to a jury of 12 would have continued unabated but for the defendant's own misconduct in tampering with juror No. 1 during the deliberative phase of the trial. By his misconduct, under circumstances that were both devious and egregious, the defendant forfeited his state constitutional right to the 12-person jury that had been empaneled specifically for him.
We would reach an opposite conclusion under different circumstances, such as if a twelfth juror were to become unavailable because of an unexpected illness or a personal life challenge were to render the juror unavailable for further proceedings. Those benign circumstances are in stark contrast with the facts here, where the unavailability of the twelfth juror during deliberations arose solely from the plotted effort of the defendant to tamper with juror No. 1 in a manner that was egregious and to prompt a mistrial.
Our learned dissenting colleague argues that the determination to proceed with an 11-person jury violated the defendant's right to substantive and procedural due process and, further, that our determination violates the separation of powers doctrine. These grounds are unpreserved for appellate review since the defendant did not raise them before the Supreme Court (see CPL 470.05[2]). Moreover, the defendant does not raise these contentions on his appeal. "We are not in the business of blindsiding litigants, who expect us to decide their appeals on rationales advanced by the parties, not arguments their adversaries never made" (Misicki v Caradonna, 12 NY3d 511, 519). "While appellate judges surely do not sit as automatons, they are not freelance lawyers either" (id. [citation and internal quotation marks omitted]).
We also respectfully disagree with our dissenting colleague that the right to a 12-person jury is more conceptually similar to the right to counsel than it is to the right to confront a witness because, as our dissenting colleague posits, counsel is replaceable while a tampered witness is not. However, here, the defendant committed his misconduct after the jury had begun its deliberations. The Court of Appeals has "h[eld] that the New York Constitution prohibits the substitution of an alternate juror after the jury has begun deliberations" (People v Murray, 39 NY3d 10, 15; see People v Ryan, 19 NY2d 100, 104-105). Thus, where the jury has begun deliberations, jurors cannot be replaced absent the defendant's consent (see CPL 270.35[1] [providing, in part, that if the trial jury has begun deliberations, the defendant must give written consent, signed by the defendant in open court in the court's presence, to the discharged juror being replaced by the alternate juror]). A refusal of consent may be used as a cudgel to force a mistrial and reward the "success" of the defendant's own attempted juror tampering. That result, in turn, irreplaceably divests the court of control over the trial that is underway and transfers control solely to the defendant who has engaged in the underlying misconduct. Forfeiture is the remedy that guards against such a manipulation of the courts where the circumstances are self-created by the defendant and egregious, similar to the forfeiture of the right to confrontation and the right to counsel.
We disagree with our dissenting colleague's conclusion that one act of intentional intimidation of a deliberating trial juror at that juror's home is not sufficient misconduct to warrant forfeiture of a defendant's right to a 12-person jury, i.e., that one strike is not enough to surrender this right. In our view, the right to a 12-person trial jury may be forfeited, just as other rights may be forfeited under egregious circumstances (see e.g. People v Shanks, 37 NY3d at 253; People v Sloane, 262 AD2d 431), such as those present here, and a criminal defendant need not tamper with multiple trial jurors before forfeiture may be invoked.
We conclude that under the egregious circumstances of this case contrived by the defendant, the defendant's conviction by an 11-person jury did not violate his state constitutional rights, as the Supreme Court properly determined that the defendant's right to a 12-person jury had been forfeited by his conduct. Otherwise, a 12-member unanimous jury remains the law for felony convictions. Our conclusion does not, contrary to our dissenting colleague's view, make new law and create an entirely new unconstitutional sanction; rather, our conclusion merely applies the long-established forfeiture doctrine.
The defendant's remaining contentions do not entitle him to relief. The defendant was not deprived of the effective assistance of counsel under the New York Constitution. The evidence, the law, and the circumstances of this case, viewed in totality and as of the time of the representation, reveal that defense counsel provided meaningful representation (see People v Benevento, 91 NY2d 708, 712; People v Baldi, 54 NY2d 137, 147; People v McManus, 219 AD3d 636, 637). Moreover, the defendant was not deprived of the effective assistance of counsel under the Federal Constitution (see Strickland v Washington, 466 US 668).
The defendant's contention that Penal Law §§ 265.03(1)(b), 265.02(1), and 265.15(4) are unconstitutional in light of the decision of the Supreme Court of the United States in New York State Rifle & Pistol Assn., Inc. v Bruen (597 US 1) is unpreserved for appellate review, since he failed to raise a constitutional challenge before the Supreme Court (see People v Cabrera, 41 NY3d 35, 41-51; People v Chase, 223 AD3d 913, 913; People v Wilson, 222 AD3d 1009, 1010; People v Manners, 217 AD3d 683, 685-686). In any event, the defendant's contention is without merit. The Bruen decision "had no impact on the constitutionality of New York's State's criminal possession of a weapon statutes" (People v Manners, 217 AD3d at 685-686; see People v Chase, 223 AD3d at 913; People v Wilson, 222 AD3d 1006, 1009).
The sentence imposed was not excessive (see People v Suitte, 90 AD2d 80).
Accordingly, we affirm the judgment.
DILLON, J.P., BRATHWAITE NELSON and VENTURA, JJ., concur.
FORD, J., dissents, and votes to reverse the judgment, on the law and as a matter of discretion in the interest of justice, and order a new trial, with the following memorandum:
In my view, the Supreme Court's determination to permit deliberation and conviction of the defendant by an 11-person jury improperly deprived the defendant of his New York State constitutional right to a jury of 12, necessitating the reversal of his conviction. My colleagues in the majority affirm this error, effectively making new law and creating an entirely new unconstitutional sanction for an already established misdemeanor. Therefore, I respectfully dissent.
The facts are not in dispute in this matter, and I rely on the comprehensive recitation of the facts by my colleagues in the majority. Furthermore, despite any critiques regarding the determination in Williams v Florida (399 US 78), this Court is unquestionably bound by its precedent. Accordingly, the defendant's contention that his federal constitutional rights have been violated must fail.
However, I respectfully disagree with the conclusion of my colleagues in the majority that the defendant's New York State constitutional rights were not violated upon permitting the jury to proceed with deliberation and conviction of the defendant by an 11-member jury.
As noted by my colleagues in the majority, the New York State Constitution specifically guarantees defendants a right to a jury of 12 (see NY Const, art I, § 2; art VI, § 18; People v Page, 88 NY2d 1, 3). New York Constitution, article I, § 2 describes the right to a trial by jury as "inviolate forever" and requires the waiver of a jury trial to be achieved by "written instrument signed by the defendant in person in open court before and with the approval of a judge or justice of a court having jurisdiction to try the offense." Consistent with this provision permitting a defendant to waive a trial by jury, the Court of Appeals has determined that a defendant may, upon a written waiver executed in the manner specified by the State Constitution, consent to a jury of 11 if a deliberating juror becomes incapacitated and no alternate juror is available (see People v Gajadhar, 9 NY3d 438, 448).
Of course, as conceded by my colleagues in the majority, there is a distinction between a waiver of a constitutional right and a forfeiture of that same right. "Whereas waiver results from a knowing, voluntary and intelligent decision, forfeiture occurs by operation of law, [*5]based on objective facts and circumstances and without regard to defendant's actual state of mind" (People v Corley, 67 NY2d 105, 110).
It is well established that a criminal defendant, through their conduct, may forfeit certain constitutional rights, including their right to confront a witness (see People v Smart, 23 NY3d 213; People v Geraci, 85 NY2d 359) and their right to counsel (see People v Shanks, 37 NY3d 244). However, I believe that the majority here errs by conflating the potential risks of harm flowing from the forfeiture of the right to confront a witness with the risks presented by a judicially created abrogation of a constitutionally enshrined right to a jury of 12 persons. A witness's role in a trial is unique, and an individual witness is irreplaceable. If a defendant procures even a single witness's unavailability "through violence, threats or chicanery" (People v Geraci, 85 NY2d at 365), without a proper remedy, the People's ability to present an effective case against the defendant may be profoundly affected. Thus, a forfeiture of the right to confront a particular witness is "realistically described as a forfeiture dictated by sound public policy" (id. at 366), as it acts as a deterrent for a defendant "'from acting on strong incentives to prevent the testimony of an adverse witness'" (id., quoting Steele v Taylor, 684 F2d 1193, 1202 [6th Cir]).
However, I submit that the right to a 12-person jury is more conceptually similar to the right to counsel, and the analysis of this matter should more closely resemble the analysis of the forfeiture of that constitutional right. In contrast to a witness, a juror, like counsel, is replaceable, but not endlessly so. The Court of Appeals has "recognized that 'egregious conduct by [a] defendant[ ] can lead to a deemed forfeiture of the fundamental right to counsel,' but only as a matter of 'extreme, last-resort . . . analysis'" (People v Shanks, 37 NY3d at 253, quoting People v Smith, 92 NY2d 516, 521). Indeed, case law suggests that, while a defendant may forfeit their right to counsel through assault (see People v Gilchrist, 239 AD2d 306, 307), threats (see People v Wilkerson, 294 AD2d 298, 298), and abusive behavior (see People v Cooper, 128 AD3d 1431, 1433), a defendant is unlikely to forfeit this constitutional right unless they have engaged in a "persistent course of egregious conduct toward successive assigned counsel" (id. [emphasis added]). Under our case law, one strike is not enough to surrender this important right.
Here, there is no dispute that the defendant's conduct was egregious and unacceptable. He feigned an illness so that he could approach a juror, at the juror's home, clearly in an attempt to influence his trial. While the defendant should not be permitted to "tak[e] advantage of his . . . own wrongdoing" (People v Smart, 23 NY3d at 220), I believe it was error for the Supreme Court to utilize the "extreme, last-resort analysis" of denying the defendant his inviolate right to a jury of 12 before considering alternate sanctions for this egregious behavior (People v Shanks, 37 NY3d at 253 [alterations and internal quotation marks omitted]). While my colleagues in the majority are concerned that granting a mistrial here may encourage future defendants to engage in jury tampering to ensure future mistrials, I am more concerned with the potential unintended consequences created by the majority's ruling. What if, in a future case, a defendant were to approach not one, but two jurors outside of the courthouse in an attempt to influence their case? What about five jurors? If this Court determines that a defendant can forfeit their right to a 12-person jury based upon this conduct, what number of jurors marks the turning point where a jury would be deemed unconstitutionally deficient? My colleagues in the majority do not answer this question.
Further, on this record, I believe that the determination to proceed with an 11-person jury violated the defendant's right to both substantive and procedural due process. "In general, procedural due process claims challenge the procedures used by the government in effecting a deprivation of a right, whereas substantive due process claims challenge the action itself. Thus, substantive due process implicates the essence of state action rather than its modalities . . . [while] [p]rocedural due process differs from substantive due process by focusing not on what a person has been deprived of, but rather on how the deprivation was accomplished" (Mark G. v Sabol, 93 NY2d 710, 723 [footnote and internal quotation marks omitted]). "In determining whether due process has been provided, the courts consider three factors: '(1) the private interest affected; (2) the risk of erroneous deprivation through the procedures used and the probable value of other procedural safeguards; and (3) the government's interest'" (People ex rel. Nevill v Toulon, 215 AD3d 874, 877, [*6]quoting County of Nassau v Canavan, 1 NY3d 134, 142). Here, as discussed above, the defendant was deprived of his constitutional right to a jury of 12 without any precedential support for this penalty, in violation of his right to substantive due process. Additionally, he was deprived of this constitutional right without any analysis by the Supreme Court of his own rights versus the competing rights and interests of the People, in violation of his right to procedural due process. The court concluded that a mistrial would be acquiescing to the defendant's misconduct without weighing or addressing the defendant's rights or considering other potential sanctions beyond proceeding with an 11-member jury or a mistrial.
I am also concerned that the determination in the majority's decision and order violates the separation of powers doctrine. New York Constitution, article III, § 1 dictates that "[t]he legislative power of this state shall be vested in the senate and assembly." "The concept of the separation of powers is the bedrock of the system of government adopted by this state in establishing three coordinate and coequal branches of government, each charged with performing particular functions" (Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 27 NY3d 174, 178 [internal quotation marks omitted]). "[D]efining crimes and fixing penalties are legislative, not judicial, functions" (Unites States v Evans, 333 US 483, 486). This Court must "read statutes as they are written and, if the consequence seems unwise, unreasonable or undesirable, the argument for change is to be addressed to the Legislature, not to the courts" (People v Kupprat, 6 NY2d 88, 90).
"A person is guilty of tampering with a juror in the first degree when, with intent to influence the outcome of an action or proceeding, he communicates with a juror in such action or proceeding, except as authorized by law" (Penal Law § 215.25). The undisputed facts of this matter support the contention that the defendant could feasibly be charged with the separate crime of tampering with a juror in the first degree, which is a class A misdemeanor (see id.). The legislature has already assigned penalties for class A misdemeanors, including a definite sentence of imprisonment that shall not exceed 364 days (see id. § 70.15[1]). Notably, the legislature did not determine that tampering with a juror in the first degree could lead to the loss of the constitutional right to a jury of 12. Even if the contention of my colleagues in the majority that the "threat of a separate criminal prosecution for the misdemeanor offenses of tampering with a juror . . . provides too little disincentive . . . to dissuade a criminal defendant from engaging in such behavior" is correct, the solution is for the legislature to address the issue, not for the courts to create an entirely new sanction out of whole cloth.
To the extent that any of the above issues may be unpreserved for appellate review, I believe they must be considered in the exercise of our interest of justice jurisdiction where, as here, the end result was the improper forfeiture of the defendant's inviolate constitutional right to a 12-person jury (see CPL 470.15[6]).
As noted in People v Shanks, "any single case may be part of some larger movement" (37 NY3d at 255 [internal quotation marks omitted]). What is troubling here is that the majority's decision and order erodes the New York State constitutional right to a jury of 12 without precedential support, without a proper balancing of the competing rights and interests of the defendant and the People, and without a proper consideration of the statutory confines set out by the legislature. Accordingly, I would reverse the judgment and order a new trial.
ENTER:
Darrell M. Joseph
Clerk of the Court